IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **RANDOLPH WILLIAMS III**<br><br>**Plaintiff,**<br><br>v.<br><br>**KEVIN K. MCALEENAN, ACTING SECRETARY, UNITED STATES DEPARTMENT OF HOMELAND SECURITY**<br><br>**Defendant.** | CIVIL NO. 2:19-CV-12841 |

## COMPLAINT

Plaintiff Randolph Williams asserts his causes of action against defendant Kevin McAleenan, solely in his official capacity as Acting Secretary of the United States Department of Homeland Security, regarding the unlawful employment actions of its agency, the United States Customs and Border Protection, as follows:

## THE PARTIES

1. Plaintiff is Randolph Williams III, a person of majority, domiciled in Louisiana within this judicial district.

2. Defendant is Kevin K. McAleenan, solely in his official capacity, the Acting Secretary of the Department of Homeland Security (DHS), including its agency, United States Customs and Border Protection (CBP) (*see* 6 U.S.C. § 112(a) establishing the Secretary of DHS as the head of the department *and also* 6 U.S.C. § 211(e) establishing U.S. CBP).

## JURISDICTION AND VENUE

3. The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question); 42 U.S.C. § 2000e-2 *et seq*. (Title VII); and 42 U.S.C. § 2000e-16 (applicability

1

of Title VII to federal employment) as more particularly set-out herein.

4. The Court has personal jurisdiction over Mr. McAleenan, in his official capacity and as the proper defendant representing the United States Department of Homeland Security (and its agency, U.S. Customs and Border Protection), because all of the unlawful employment practices alleged herein occurred in the state of Louisiana and give rise to the specific Title VII causes of action in this case, and thus Mr. McAleenan, in his official capacity and as the proper defendant for DHS and CBP, has established minimum specific contacts with Louisiana, arising from the specific facts of this case, comporting with the requirements of fair play, substantial justice, and the Fourteenth Amendment of the Constitution of the United States.

5. Venue for Mr. Williams' Title VII claim is proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3) because the alleged discriminatory employment practices occurred within this forum (specifically New Orleans), and Mr. Williams would have continued to have been employed in his otherwise promoted position in this forum but for the his discriminatory non-selection at issue in this case.

## PROCEDURAL AND STATUTORY ALLEGATIONS

6. At all relevant times, CBP employed more than 500 employees.

7. In 2002, CPB hired Mr. Williams (black) as a United States Border Patrol agent.

8. Mr. Williams has been continuously employed by CBP since that time and assigned to the Office of the United States Border Patrol.

9. On or about March 30, 2018, CBP advertised a position for a Supervisory Border Patrol Agent (Division Chief) assigned to USBP's "New Orleans Sector" located in New Orleans, LA.

10. On or about April 4, 2018, Mr. Williams timely applied for the position which, if received, would have constituted a significant promotion to Mr. Williams in terms of pay, substantive

2

responsibilities, and supervisory responsibilities.

11. Effective on or about October 14, 2019, the responsible management official with decision-making authority over the selection for the Division Chief position, Chief Patrol Agent Gregory Bovino, promoted USBP agent Christopher Bullock (white) to the Division Chief position over Mr. Williams.

12. Upon information and belief, the effective start date of Mr. Bullock's promotion to Division Chief was October 14, 2019.

13. On November 28, 2019, Mr. Williams timely initiated informal EEO contact alleging that CPA Bovino's decision to promote Mr. Bullock over Mr. Williams was unlawful, discriminatory, and based on Mr. Williams's race.

14. On February 14, 2019, CBP issued its Notice of Right to File to Mr. Williams.

15. On February 27, 2019, Mr. Williams timely filed his Individual Complaint of Employment Discrimination in this matter (case no. HS-CBP-00457-2019).

16. On May 13, 2019, CBP took final action and dismissed Mr. Williams's complaint.

17. On June 28, 2019, CBP mailed notice of its final action to Mr. Williams via USPS certified mail (tracking no. 7017 1450 0001 9087 1647).

18. Mr. Williams first received CBP's final notice via certified mail on July 9, 2019.

19. Mr. Williams timely files this federal complaint within 90 days of receiving CBP's final action.

## FACTS

**A.    The Plaintiff – Randolph Williams**

20. Randolph Williams is a 42-year-old man, who is black, and who lives with his wife and child in Luling, Louisiana.

21.     Mr. Williams began his full-time career as a United States Border Patrol Agent in 2002.

22.     Through excellent work and dedication to service, Mr. Williams earned multiple promotions within the USBP and, during the relevant times of this case, was assigned as the acting Division Chief for Operational Programs for the entire USBP New Orleans Sector located in New Orleans, LA.

23.     Today, Mr. Williams is assigned as the permanent Patrol Agent in Charge of New Orleans Station located in New Orleans, Louisiana.

**B.     The Employing Agency – U.S. Customs and Border Protection, Office of United States Border Patrol**

24.     As a USBP agent, Mr. Williams is employed by United States Customs and Border Protection (CBP) and assigned to its Office of the United States Border Patrol.

25.     CBP is a statutory agency of the United States Department of Homeland Security.

26.     USBP is a statutory office of the CBP.

27.     At all relevant times, CBP employed more than 500 employees.

28.     USBP's statutory mission is to serve as the law enforcement office of CBP, and to interdict persons illegally entering or exiting the United States; interdict illegally imported or exported goods at points other than ports of entry; and deter and prevent the entry of terrorists, terrorist weapons, and other contraband.

**C.     USBP's Organizational and Leadership Structure**

29.     USBP's national headquarters is located in Washington D.C.

30.     USBP is geographically organized into "sectors," and each sector often cover multiple U.S. states, large linear stretches of the United States international border, and very large sections of United States territory.

31.     Each sector maintains its own leadership and support staff which provide leadership,

supervision, and mission support throughout the region.

32. The chief decision-maker with respect to all agency and personnel decisions at the sector-level is the Chief Patrol Agent (CPA).

33. The executive officer who assists the CPA is the Deputy Chief Patrol Agent (DCPA).

34. Typically, leadership at the sector-level then consists of different divisions, such as "division of law enforcement operations," or "division of operational support," and is headed-up by a Supervisory Border Patrol Agent, often referred to as a "Division Chief."

35. USBP also employees civilians (as opposed to career agents), and when a civilian employee occupies a "Division Chief" position, they are sometimes referred to as a "Director" to signify their civilian status.

36. Thus, leadership and command structure at the sector-level, and specifically the New OrleansSector, often looks like this:



37. Typically, at the sector level, the general schedule pay scale for Chief Patrol Officer and Deputy Chief Patrol Officer are GS-15.

38. Typically, at the sector level, the general schedule pay scale for Division Chiefs and Directors are GS-15 or GS-14.

39. Specifically at the New Orleans Sector, there are three Division Chief positions – (1) Division Chief of Law Enforcement Operations; (2) Division Chief of Operational Programs; and (3) Division Chief of Operational Support.

40. Further, each USBP sector is organizationally subdivided into "stations."

41. Each station discharges local law enforcement operations of the surrounding territory.

42. The chief decision-maker with respect to all agency and personnel decisions at the station-level is the Patrol Agent-in-Charge (PAIC).

43. Finally, each sector maintains an intelligence division tasked with providing operational intelligence to sector and station leadership.

44. This chief decision-maker for the intelligence division is also a Patrol Agent-in-Charge (PAIC).

45. Typically, at the station level, the general schedule pay scale for PAIC's are GS-15 or GS-14, or GS-13.

46. During most of the relevant times in this case, Mr. Williams was permanently assigned as the PAIC of the New Orleans Station with pay grade GS-1896-13.

**D.   USBP's Leadership Structure Appears to Be Segregated Based on Race**

47. Upon information and belief, a significant number of USBP agents are black or African American.

48. Upon information and belief, USBP contains one national headquarters, twenty different sectors, and many stations, each with its own leadership structures.

49. Upon information and belief, throughout the entire USBP, there are currently no black USBP agents who are assigned to positions at the Associate Chief or higher at the USBP headquarters.

50. Upon information and belief, throughout the entire USBP, there are currently no black USBP agents who are assigned as Chief Patrol Agents.

51. Upon information and belief, throughout the entire USBP, there are currently no black USBP agents who are assigned as Deputy Chief Patrol Agents.

52. Upon information and belief, throughout the entire USBP, there are currently no black USBP agents who are permanently assigned as Division Chiefs or Directors.

53. Upon information and belief, there are no black USPB agents who occupy positions with general schedule pay scales of GS-15.

54. Upon information and belief, there is, in effect, a complete lack of any black USBP agents who occupy any senior leadership positions throughout the entirety of the United States Border Patrol, despite the fact that black USBP agents represent a significant, statistical composition of the total USBP workforce.

55. Upon information and belief, for the reasons described above, the USBP is currently and de facto segregated based on race.

56. Upon information and belief, there is a de facto ceiling for black and African American USBP agents at the GS-14 level – meaning, that upon information and belief promotion opportunities are simply denied to black and African American USBP agents past the PAIC level.

**E.  Mr. Williams Hits the Glass Ceiling**

57. During 2017, the CPA of New Orleans Sector was John Richards (white).

58. On July 6, 2017, Mr. Williams requested from CPA Richards a lateral transfer from the PAIC of the Sector Intelligence Unit to the PAIC of the New Orleans Station.

59. On July 14, 2017, CPA Richards approved the lateral transfer.

60. On July 27, 2017, CPA Richards informed Mr. Williams that, based on prior USBP guidance, lateral transfers were disfavored and that Mr. Williams would need to wait until such a time as the PAIC position for New Orleans Station was competitively advertised via

USAJobs.com. Subsequently, CPA Richards did advertise the PAIC position competitively; Mr. Williams applied; and CPA Richards selected Mr. Williams and promoted him to the permanent PAIC of New Orleans Station.

61. Later, CPA Richards retired, and the then-Deputy Chief Patrol Agent of New Orleans Sector, Joseph Banco (white), became Acting Chief Patrol Agent for the sector.

62. This personnel movement ultimately opened a vacancy for the New Orleans Sector position of Division Chief of Law Enforcement Operations.

63. On January 21, 2018, Acting CPA Banco temporarily promoted Mr. Williams to the position of Acting Division Chief of Law Enforcement Operations.

64. Mr. Williams performed his duties as Division Chief in an exemplary fashion.

65. Shortly thereafter, ACPA Banco announced a permanent position for Division Chief of Operational Programs via USAJobs.com.

66. On April 4, 2018, while Mr. Williams was already serving as Acting Division Chief of Law Enforcement Operations, he applied for permanent promotion to the position of Division Chief of Operational Programs.

67. On May 7, 2018, ACPA Banco selected Mr. Williams to interview for the position with himself and the then-acting Deputy Chief Patrol Agent of New Orleans Sector, Teresa Pedregon (white, Hispanic).

68. However, during the intervening time period, USBP selected agent Gregory Bovino to become the new, permanent Chief Patrol Agent of New Orleans Sector.

69. Upon information and belief, CPA Bovino favors white, non-Hispanic men over other demographics of agents.

70. On May 11, 2018, before Mr. Williams could interview for the Division Chief position,

CPA Bovino cancelled the job posting, specifically indicating in the cancellation that the position would be re-posted via USAJobs.com at a later date.

71. Mr. Williams continued to serve as the Acting Division Chief for Law Enforcement Operations until Chief Bovino removed him from the position effective July 7, 2018.

72. Regarding Mr. Williams's service as Division Chief, Bovino remarked in a memorandum that "[e]mployees such as [Agent Williams] set the example and demonstrate to others the dedication for which the men and women of the U.S. Border Patrol are recognized."

73. Nevertheless, CPA Bovino did not competitively repost the Division Chief position on USAJobs.com.

74. Instead, CPA Bovino laterally promoted another agent currently serving outside of New Orleans Sector, Christopher Bullock, to become the new, permanent, Division Chief of Operational Programs.

75. Upon information and belief, just as Mr. Williams was not permitted to laterally transfer to the position of PAIC of New Orleans Station in 2017, it was equally inappropriate for CPA Bovino to laterally promote Mr. Bullock to the position of Division Chief in 2018.

76. Mr. Bullock's effective start date in the position of Division Chief was October 14, 2019.

77. Upon information and belief, Mr. Williams is objectively more qualified to serve as Division Chief of Operational Programs in New Orleans Sector than Mr. Bullock.

78. Upon information and belief, CPA Bovino originally cancelled the posting for the Division Chief position because he did not want to promote Mr. Williams to the position because of his race.

79. Upon information and belief, CPA Bovino would have selected Mr. Williams as the Division Chief of Operational Programs, effective October 14, 2018, had Mr. Williams been white.

80. Upon information and belief, CPA Bovino only undertook these personnel decisions with respect to Mr. Williams and Mr. Bullock because he had either explicit or implicit authorization to do so from senior leadership at USBP Headquarters in Washington D.C.

81. Upon information and belief, senior leadership at USBP Headquarters either directly or indirectly directs discriminatory personnel actions, such as and including Mr. Williams's non-selection for the Division Chief position, because of systemic, disparate attitudes regarding race.

82. That is to say, upon information and belief, senior leadership at USBP Headquarters either directly or indirectly directs discriminatory personnel actions that promote USBP agents who are white over agents who are not white.

83. Later, after Deputy Chief Patrol Agent Banco retired, CPA Bovino temporarily promoted Mr. Bulllock to the more senior Division Chief position, "Division Chief of Law Enforcement Operations."

84. This created a new, temporary opening in the Division Chief of Operational Programs position.

85. CPA Bovino promoted another agent, Robert Rivet (white), into that position.

86. Previously, Mr. Rivet had served as an Operations Officer at the New Orleans Sector – a position that was less senior than Mr. Williams's position of PAIC of New Orleans Station.

87. Thus, for a time, CPA Bovino promoted an agent who was less senior to Mr. Williams into the Acting Division Chief of Operational Programs position – such that Mr. Williams during this time actually reported to Mr. Rivet.

88. Mr. Williams complained, arguing that a competitive posting should have been made for the position.

89. Eventually, CPA Bovino relented, competitively posted the Division Chief position, and

selected Mr. Williams to serve as Acting Division Chief of Operational Programs until approximately July 2019, when CPA Bovino hired another white USBP agent to fill the position of Deputy Chief Patrol Agent.

90. At present, Mr. Williams serves in his permanent position of PAIC of New Orleans Station.

**F.   The Aftermath**

91. Because of his discriminatory non-selection for the promoted, GS-14 position of Division Chief of Operational Programs, Mr. Williams is out significant lost back and future wages.

92. Because of his discriminatory non-selection for the promoted, GS-14 position of Division Chief of Operational Programs, Mr. Williams has suffered non-compensatory damages including for stress, loss of reputation, and mental anguish.

93. Because of his discriminatory non-selection for the promoted, GS-14 position of Division Chief of Operational Programs, Mr. Williams is out future promotion opportunities and associated lost future wages.

94. Because of his discriminatory non-selection for the promoted, GS-14 position of Division Chief of Operational Programs, Mr. Williams has been forced to retain an attorney in this matter and has incurred reasonable attorney's fees and litigation costs.

## CAUSES OF ACTION

### Unlawful Disparate Treatment Race Discrimination Under Title VII

95. Mr. Williams states a cause of action against defendant for unlawful disparate-treatment discrimination based on his race (black) concerning his non-selection for the position of permanent Division Chief of Operational Programs at New Orleans Sector in favor of his white comparator, Christopher Bullock.

96.     Title VII of the Civil Rights Act of 1964 (as amended) forbids an employer from discriminating against any employee on account of the person's race. 42 U.S.C. §2000e-2(a)(1). An employer illegally discharges an employee based on his race when race is at least one of the factors motivating the discharge. *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005); *cf* 42 U.S.C. § 2000e–2(m) (codifying that an employee proves unlawful discrimination when a protected status "was a motivating factor for any employment practice, even though other factors also motivated the practice"). When direct evidence of discrimination is not available, an employee may prove his case with circumstantial evidence that he "(1) is a member of a protected class; (2) was qualified for the position; (3) was subjected to an adverse employment action; and (4) was replaced by someone outside the protected class, or in the case of disparate treatment, shows that other similarly situated employees [not in the protected class] were treated more favorably." *Bryan v. McKinsey & Co.,* 375 F.3d 358, 360 (5th Cir. 2004).

97.     Alternatively, "[s]tatistical evidence is also of central importance in a disparate treatment case[,]" and an employee may prove his prima facie case statistically "if gross statistical disparities in the composition of an employer's work force can be shown." *Pouncy v. Prudential Ins. Co. of Am.*, 668 F.2d 795, 802 (5th Cir. 1982). Specifically, when "the statistical showing is sufficiently strong in a disparate treatment action, [an employee's] prima facie case can be made without additional evidence establishing that defendant purposefully treated minorities protected under Title VII less favorably than other persons." *Id.* "If statistical evidence is insufficient to establish discriminatory intent, [employees] may bolster their case by introducing historical, individual, or circumstantial evidence." *Anderson v. Douglas & Lomason Co., Inc.*, 26 F.3d 1277, 1285 (5th Cir. 1994).

98.     Finally, in a Title VII action, an employer is vicariously liable for its manager's

discriminatory acts when the manager serves as the employer's agent, or when the employer knew or should have known of the manager's discriminatory conduct and took no remedial action. *See e.g.*, *Flanagan v. Aaron E. Henry Cmty. Health Servs. Ctr.*, 876 F.2d 1231, 1235 (5th Cir. 1989).

99. In this case, U.S. Customs and Border Protection, and its Office of United States Border Patrol, has a statistically apparent and historical pattern of denying promotion opportunities to black and African American agents in favor of promoting predominantly white agents (and usually white, male agents) to the senior-most leadership positions at the sector-level, headquarters, and across the entire GS-15 pay scale.

100. Additionally, and specifically in this case, the personnel decisions of USBP and CPA Bovino against Mr. Williams were upon information and belief specifically motivated by race-based animus.

101. Specifically, former CPA Richards approved Mr. Williams for a lateral transfer to PAIC of New Orleans Station in 2017, but then rescinded that transfer because, apparently, it contravened USBP policy which required a competitive job posting for promotion opportunities. CPA Richards competitive advertised the position; Mr. Williams applied; and CPA Richards selected Mr. Williams for the PAIC position. Then, in 2018, former Acting CPA Banco promoted Mr. Williams to the position of Acting Division Chief of Law Enforcement Operations, a position in which not only did Mr. Williams excel, but for which current CPA Gregory Bovino publicly praised his performance before demoting him from it. Likewise, almost immediately after assuming the duties of Chief Patrol Agent, CPA Bovino cancelled the competitive posting for the permanent Division Chief of Operational Programs position for which Mr. Williams had already applied and been selected to interview. CPA Bovino indicated that the position would be re-advertised in the future, but in hindsight this was not true.

102. Then, effective on October 14, 2018, and without notice or competitive posting, CPA Bovino laterally promoted and hired of a white, male comparator who was less qualified than Mr. Williams to assume the permanent position of Division Chief of Operational Programs. This was done despite the apparent USBP policy against lateral promotions in favor of competitive job postings.

103. Mr. Williams timely initiated the EEO process within 45 days of the effective start date of Mr. Bullock's promotion to the Division Chief position, and Mr. Williams specifically complained that the adverse non-selection was motivated by race-based animus in violation of Title VII. Mr. Williams ultimately exhausted his administrative remedies and timely filed this lawsuit.

104. During the pendency of Mr. Williams's EEO process, CPA Bovino briefly promoted a less-senior, white, male agent to the Acting Division Chief of Operational Programs over Mr. Williams, only to reverse his decision when Williams formerly complained.

105. Upon information and belief, CPA Bovino promoted Christopher Bullock over Mr. Williams to the permanent position of Division Chief of Operational Programs because of race-based animus in favor of Mr. Bullock and against Mr. Williams. Stated another way, had Mr. Williams been white, CPA Bovino would have promoted Mr. Williams to the permanent Division Chief of Operational Programs position. Upon information and belief, CPA Bovino made these adverse personnel decisions with either explicit or implicit instructions from senior decision-makers at USBP headquarters.

106. Accordingly, CPA Bovino's decision to promote Christopher Bullock over Mr. Williams, effective October 14, 2018, to the permanent position of Division Chief of Operational Programs constituted an adverse personnel action, specifically an adverse non-selection for promotion, in violation of Title VII.

107. At all times, the decisions of CPA Bovino and senior leadership officials at USBP headquarters were done purposefully, within the course and scope of their duties, and as agents of Customs and Border Protection.

108. Accordingly, Customs and Border Protection is liable for all actual and statutory damages suffered by Mr. Williams resulting from CBP and USBP's illegal and racially motivated employment actions, including, but limited to, back pay, front pay, compensatory damages, mental anguish damages, and his reasonable attorney's fees incurred in this action, and CBP is liable to reinstate Mr. Williams to the Division Chief position for which he was unlawfully not selected.

## JURY DEMAND

Mr. Williams requests a trial by jury on all claims and causes of action asserted in this matter.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Randolph Williams prays that his complaint be deemed good and sufficient; that it and summons be served upon defendant Kevin McAleenan, solely in his official capacity as Acting Secretary of the United States Department of Homeland Security; and, after due proceedings are had, that judgment be entered in favor of plaintiff and against defendant for (1) all damages and equitable relief due to plaintiff, including compensatory damages, statutory damages, costs, attorney's fees, and legal interest from the date of demand; (2) an injunction ordering defendant to reinstate Mr. Williams to the permanent position of Division Chief of Operational Programs at New Orleans Sector or to any other position equity requires; and (3) an injunction prohibiting defendant from engaging in all current and future race-based discrimination against black and African American USBP agents seeking promotion to any GS-14, GS-15, or higher general schedule pay grade; and for all other general and equitable relief plaintiff is entitled.

Respectfully submitted:

/s/ Kevin S. Vogeltanz
Kevin S. Vogeltanz, TA (Bar #32746)
The Law Office of Kevin S. Vogeltanz, LLC
823 Carroll Street, Suite A
Mandeville, LA 70448
Telephone:  (504) 275-5149
Facsimile:  (504) 910-1704
Email: vogeltanz@gmail.com

*Counsel for Randolph Williams*