UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **RANDOLPH WILLIAMS III** | * | No. 19-CV-12841 |
| | * | SECTION "T" (3) |
| v. | | |
| | * | JUDGE GUIDRY |
| **CHAD F. WOLF, ACTING SECRETARY, UNITED STATES DEPARTMENT OF HOMELAND SECURITY** | * | MAGISTRATE DOUGLAS |
| | * * * | |

**MEMORANDUM IN SUPPORT OF**
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

**MAY IT PLEASE THE COURT**

Plaintiff, Randolph Williams, a federal employee of defendant, the U.S. Department of Homeland Security ("DHS"), United States Border Patrol ("USBP"), files this action under Title VII alleging he was not selected for the position of permanent Supervisory Border Patrol Agent-Division Chief ("Division Chief") at the New Orleans Sector because of his race, Black. Rec. Doc. 1, Complaint, ¶¶ 3, 7, 8, 95. Plaintiff's claim fails for the following reasons: (1) Plaintiff failed to contact an EEO counselor within 45 days of learning that Christopher Bullock was non-competitively selected for the Division Chief position; (2) even if Plaintiff had made timely contact with an EEO counselor, he cannot make a prima facie showing because he did not apply or was he qualified to apply for a lateral reassignment to the Division Chief position; and, lastly (3) even if Plaintiff makes a prima facie showing, he could not demonstrate that Chief Patrol Agent Gregory Bovino's reasons for selecting Mr. Bullock were not true but instead a pretext for intentional discrimination. Thus, defendant Chad F. Wolf, Acting Secretary, urges the dismissal of Plaintiff's suit under Rule 56 of the Federal Rules of Civil Procedure at his costs.

1

## I. STATEMENT OF THE CASE

### A. Plaintiff's Claim

Plaintiff Randolph Williams is the Patrol Agent in Charge ("PAIC") of the New Orleans Border Patrol Station. Rec. Doc. 23-2, Declaration of Randolph Williams, ¶ 4. Plaintiff has worked for DHS, U.S. Customs and Border Protection ("CBP"), USBP since 2002. *Id.* at ¶ 5; *see also* Rec. Doc. 1, Complaint, ¶ 7, 23.

In March of 2018, USBP advertised, through a vacancy announcement on USAJobs, a Division Chief position. Exhibit A-1, Plaintiff's Individual Complaint of Employment Discrimination, Bates DHS0004, ¶ 1. On April 4, 2018, Plaintiff applied for the advertised Division Chief position and was selected to be interviewed for the vacant position. *Id*. However, on May 11, 2018, Plaintiff was advised that the vacancy announcement was cancelled. *Id.*

Later, on August 6, 2018, Plaintiff attended a staff meeting wherein Chief Patrol Agent Bovino ("Chief Bovino") announced that Christopher Bullock had been non-competitively selected for the vacant Division Chief position sought by Plaintiff. Exhibit A-3, Plaintiff's Clarification Letter and Attachments, Bates DHS0014 and DHS0015. Chief Bovino did not competitively repost the Division Chief position on USAJobs.com but laterally reassigned Mr. Bullock, an agent who had been working outside of the New Orleans Sector. Rec. Doc. 1, Complaint, ¶¶ 73, 74.

Neither did Plaintiff apply for nor was he eligible to apply for a lateral reassignment to the Division Chief position. Exhibit G, Deposition of Randolph Williams, p. 12, lines 12-16; p. 13, lines 12-16.

### 1.     Plaintiff untimely contacts an EEO counselor

Mr. Bullock entered on duty as the new Division Chief in the New Orleans Sector on October 14, 2018, and on November 28, 2018, Plaintiff contacted an EEO counselor. Exhibit A-1, Plaintiff's Individual Complaint of Employment Discrimination, Bates DHS0002, DHS0004. Thereafter, Plaintiff filed a formal complaint alleging racial (Black/African American) discrimination when Mr. Bullock was not selected for the Division Chief position via lateral reassignment request. *Id.*, at Bates DHS0002-DHS0004.

Because Plaintiff did not contact an EEO counselor within 45 days of the matter alleged to be discriminatory, an EEO Specialist/Investigator sought additional information regarding the timeliness of Plaintiff's claim of discrimination, including whether or not he had ever received EEO training or No Fear Act training. Exhibit A-2, Agency's Request of Plaintiff for Clarification Regarding his Discrimination Complaint, Bates DHS0009-DHS0011.

On March 8, 2019, Plaintiff responded to the EEO Specialist's questions regarding his complaint and the timeliness issue. Exhibit A-3, Plaintiff's Clarification Letter and Attachments, at Bates DHS0012 - DHS0018. Plaintiff explained that he was not raising the first claim ("On July 27, 2017, an earlier approval to be laterally reassigned from the Intelligence Unit was retracted since it was not announced competitively.") but that it served as supporting evidence for his second claim ("On or around August 6, 2018, he learned that he was not selected for the position of Division Chief, GS-1896-14, advertised under Job Opportunity Announcement Number: USBP-IMP-10168092-JRB (JOA 10168092."). *Id.*, at Bates DHS0013.

Plaintiff also stated that he became aware that he was not selected for the Division Chief position on August 6, 2018 when during a staff meeting Chief Bovino announced that he had selected Mr. Bullock. *Id.*, at Bates DHS0014 - DHS0015. Plaintiff also admitted that he had

undergone No Fear Act Training and had seen the EEO poster in the break room at the New Orleans Sector. *Id.*, at Bates DHS0017. Plaintiff attached a copy of the EEO poster that clearly highlights the 45-day time limitation for contacting an EEO counselor. *Id.,* at DHS0024.

Thereafter, the Office of Civil Rights and Civil Liberties ("CRCL") dismissed Plaintiff's administrative EEO complaint because of Plaintiff's untimely contact with an EEO counselor. Exhibit A-5, Bates DHS0035. The CRCL noted that Title 29 C.F.R. § 1614.105(a)(1) provides, in part, that an aggrieved person must initiate contact with a counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action. *Id.* The CRCL found that Plaintiff learned of the vacancy announcement cancellation on May 11, 2018, and was informed of the lateral reassignment selection on August 6, 2018, which is 156 days and 69 days beyond the 45-day requirement to initiate EEO contact. *Id.* at Bates DHS0037. Accordingly, the EEO complaint was dismissed pursuant to 29 C.F.R. § 1614.107(a)(2) for untimely EEO Counselor contact. *Id.*

### B. Statement of the Facts

#### 1. CBP and USBP

The USBP is a component agency of CBP, within DHS. Exhibit D, Declaration of Richard M. Hudson, ¶ 2. The USBP is the primary federal law enforcement organization responsible for preventing the entry of terrorists and terrorist weapons from entering the United States between official U.S. Customs and Border Protection ports of entry. *Id.* Its traditional mission is to enforce immigration laws and to detect, interdict and apprehend those who attempt to illegally enter or smuggle people or contraband across U.S. borders between official ports of entry. *Id.* It has a workforce of over 20,000 agents assigned to patrol the more than 6,000 miles of America's land borders. *Id.*

The USBP has its headquarters in Washington, D.C. *Id.* at ¶ 3. The Chief of the USBP sits atop the organizational chart, the Deputy Chief of the USBP is the second highest position, and the Chief of the Law Enforcement Operations Directorate is third in command. *Id.*

The USBP divides its operations into twenty field offices known as sectors. *Id.* at ¶ 4. Each sector has a Chief Patrol Agent (CPA). The CPA, as the highest management official in a sector, plans, directs, and implements all facets of the Border Patrol program and related activities in the sector. *Id.* Similarly to headquarters, each sector has a Deputy CPA who is second in the chain of command, and then two or three Division Chiefs depending on the size of the sector. *Id.* All CPAs directly report to the Chief of the Law Enforcement Operations Directorate at headquarters. *Id.*

**2. Chief Bovino is selected to be the CPA of the New Orleans Sector which has a vacant Division Chief position**

In April of 2018, Richard Hudson, then acting Chief of the Law Enforcement Operations Directorate at USBP, recommended the selection of Gregory Bovino as the CPA of the New Orleans sector. *Id.* at ¶ 5. The Deputy Chief of the USBP and Chief of the USBP concurred with Mr. Hudson's recommendation and Chief Bovino was selected as the New Orleans CPA with a start date in July 2018. *Id.*

The New Orleans Sector, by budget and assigned personnel, is one of the smallest USBP sectors. *Id.* Prior to Chief Bovino's arrival, the New Orleans sector's interdiction and apprehension statistics were considered subpar by USBP management personnel at headquarters. *Id.* Furthermore, the New Orleans sector had the reputation of an underperforming sector with numerous personality conflicts amongst the sector management team. *Id.* Mr. Hudson

5

recommended Chief Bovino as the New Orleans CPA, in part, because of Mr. Hudson's belief that Chief Bovino could increase sector productivity and improve employee morale. *Id.*

Prior to Chief Bovino's selection as the CPA, Joseph Banco, the acting CPA of the New Orleans Sector authorized the posting of a job announcement for a Division Chief position, grade level GS-14, in New Orleans on USAJOBS.gov. *Id.* at ¶ 6. After the job announcement, the Minneapolis Hiring Center created two certificates of eligible candidates—the Merit Referral List and the Competitive Merit Promotion List. *Id.* The applicants on the Merit Referral List held or previously held a GS-14 position; the applicants on the Competitive Merit Promotion list had never held a GS-14 position. *Id.* Plaintiff was on the Competitive Merit Promotion List as he had never previously held as GS-14 position. *Id.*

Acting CPA Banco advised Chief Bovino that he, Banco, and acting DCPA Teresa Pedregon had determined that there were six candidates that they had selected from a larger pool of candidates that they intended to interview for the vacant Division Chief position and asked him, Chief Bovino, if he wanted to take part in the interviews. Exhibit B, Declaration of Gregory Bovino, ¶ 3.

Around this same time, acting CPA Banco also notified Chief Bovino that there was a list of eligible candidates for a vacant PAIC position at the Lake Charles Station. *Id.* at ¶ 4. Lake Charles is a station in the New Orleans Sector. *Id.* Patrol Agents in Charge are the top management officials at Border Patrol stations and directly report to the Division Chiefs at the New Orleans Sector. *Id.*

Chief Bovino was concerned that the acting leadership team in the New Orleans sector was trying exclude or limit his involvement from the selection process of the senior staff of the New Orleans Sector. *Id.* at ¶ 5. It was Chief Bovino's experience that incoming CPAs played a

6

prominent role in the selection of open vacancies on their senior staff. Exhibit B, Declaration of Gregory Bovino, ¶ 5. After discussing the matter with Richard Hudson, Chief Bovino decided to advise acting CPA Banco to cancel both vacancy announcements so he, Chief Bovino, could be more involved in the selection process and potentially recruit candidates who he felt would be strong candidates for the positions. *Id.*

Mr. Hudson testified that in USBP, it is customary for an incoming CPA to play a role in the selection of vacant positions on his senior staff. Exhibit D, Declaration of Richard Hudson, ¶ 7. Furthermore, it was not uncommon for a CPA to cancel a certificate if the CPA did not believe that any of the candidates had the desired traits for the position. *Id.* In May 2018, Chief Bovino contacted Mr. Hudson about cancelling the two certificates of eligible candidates for the open New Orleans Division Chief position and reposting the job announcement. *Id.* at ¶ 7. Chief Bovino advised that he did not believe that the announcement received adequate attention and wanted to try to recruit additional candidates. *Id.* In response, Mr. Hudson advised Mr. Bovino that he could go forward with cancelling the Division Chief job announcement.

### 3. The vacant Division Chief position is filled by non-competitive lateral reassignment

CBP, including the USBP, is able to fill vacant positions through a number of different procedures. Exhibit E, Declaration of Michael Rosamond, ¶ 2. One such procedure is a non-competitive lateral reassignment. *Id.* To be eligible for a lateral reassignment, a candidate must currently hold or have previously held a position with the same or higher full performance grade level on a permanent basis and not have been demoted for conduct or performance issues. *Id.*

Border Patrol Agents generally seek a lateral reassignment by submitting a memorandum to the CPA of the sector that they wish to be reassigned to. *Id.* at ¶ 3. If the Chief would like to select an employee who applied for a non-competitive lateral reassignment, he may do so in

coordination with the approval of USBP Headquarters. *Id.* Guidance issued by Ronald Vitiello, Chief of USBP, in 2017 stated that lateral reassignment requests were to be used infrequently, but were still permissible as long as the CPA coordinated with the Law Enforcement Operations and Mission Readiness Operations Directorates. *Id.*

In the month following the cancellation of the vacancy announcement, Chief Bovino received, via memorandum, two lateral reassignment requests for the Division Chief position. Exhibit B, Declaration of Gregory Bovino, ¶ 6. The first request for lateral reassignment came from Supervisory Border Patrol Agent Eric Billings and, thereafter, Deputy Patrol Agent in Charge ("DPAIC") Christopher Bullock submitted the second request for lateral reassignment. *Id.* at ¶ 7; *see also* Exhibit B-1, Memorandum, Recommendation for Vacant GS-14 Division Chief, New Orleans Sector. Both agents were eligible for a lateral reassignment because they held or previously held a GS-14 position. Exhibit B, Declaration of Gregory Bovino, ¶ 6.

Plaintiff did not apply for the lateral reassignment. Exhibit G, Plaintiff's Deposition, p. 12, lines 12-17. Plaintiff was not eligible to apply for the lateral reassignment. *Id.*, at p. 13, lines 12-16.

Chief Bovino and Mr. Bullock had worked together, on and off, for approximately twenty years. Exhibit B, Declaration of Gregory Bovino, ¶ 8. At one time, Mr. Bullock was the DPAIC at the Imperial Beach Station while Chief Bovino served as the PAIC at that station. Chief Bovino knew Mr. Bullock to be a fine agent and strong, proven leader in difficult environments. *Id.* Mr. Bullock's experience as the DPAIC at the Tucson Sector Intelligence Unit was a valuable asset in furtherance of Chief Bovino's strategy for the New Orleans Sector. *Id.* Chief Bovino's vision for the New Orleans Sector included a fresh focus on proactively targeting the illegal entries of people

and contraband originating from the Southwest border, and Mr. Bullock's Tucson experience in doing just that was directly in line with that vision. *Id.*

As the CPA, Chief Bovino did not have the authority to grant a lateral reassignment request to a GS-14 position. *Id.* at ¶ 9. Therefore, on July 19, 2018, Chief Bovino sent a formal request for Lateral Reassignment of Mr. Bullock to Mr. Hudson, Acting Chief Law Enforcement Operations Directorate at Headquarters, setting forth his reasons for believing that Mr. Bullock was right person for the Division Chief position at the New Orleans Sector. Exhibit B-1, Bates DHS001-DHA008. Thereafter, Chief Bovino learned that he also needed the concurrence of Scott Luck, Acting Deputy Chief of USBP at Headquarters. Exhibit B, Declaration of Gregory Bovino, ¶ 10. Therefore, on July 30, 2018, Chief Bovino sent a Memorandum Recommendation for Vacant GS-14 Division Chief, New Orleans Sector to not only Mr. Hudson but also Scott Luck. *Id.*; *see also* Exhibit B-1, Bates DHS009-DHA010.

Chief Bovino's request to laterally reassign Mr. Bullock from Tucson Sector to the vacant Division Chief at New Orleans Sector was approved by both Mr. Hudson and Mr. Luck. *Id.*; *see also* Exhibit B, Declaration of Gregory Bovino, ¶ 10.

II. **<u>SUMMARY JUDGMENT STANDARD</u>**

A motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) (*en banc*). As to issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The burden shifts to the respondent to direct the attention of the

court to evidence in the record sufficient to establish that there is a genuine dispute of material fact requiring a trial. *Id.* The responding party may not rest on mere allegations made in the pleadings as a means of establishing a genuine dispute worthy of trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Little*, 37 F.3d at 1075. The non-moving party does not demonstrate the existence of a genuine dispute of fact by asserting "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or only by a scintilla of evidence." *Little*, 37 F.3d at 1075; *Douglass v. United States*, 79 F.3d 1415, 1429 (5th Cir. 1996). Further, Rule 56 "does not impose on the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 916 n.7 (5th Cir. 1992).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. No genuine dispute of material fact exists if a rational trier of fact could not find for the nonmoving party based on the evidence presented. *National Ass'n of Gov't Employees v. City Pub. Serv. Bd.*, 40 F.3d 698, 712 (5th Cir. 1994).

As shown from the pleadings, the law, the attached Statement of Undisputed Facts, and the attached exhibits, there are no genuine issues of material fact, and Defendant is entitled to a judgment as a matter of law. Fed.R.Civ.Pro. 56(c).

The attached exhibits included:

Exhibit A  Declaration of Lisa Culpepper

Exhibit B  Declaration of Gregory K. Bovino

Exhibit C  Declaration of Scott A. Luck

Exhibit D  Declaration of Richard M. Hudson

        Exhibit E        Declaration of Michael J. Rosamond

        Exhibit F        Declaration of Christopher Bullock

        Exhibit G        Deposition transcript of Randolph Williams

### III. **PLAINTIFF DID NOT TIMELY CONTACT THE EEO COUNSELOR**

Plaintiff's November 28, 2018, contact with an EEO counselor was untimely.

Prior to bringing suit for employment discrimination claims, a federal employee must exhaust his administrative remedies. *See Fitzgerald v. Sec'y, U.S. Dep't of Veterans Affairs*, 121 F.3d 203, 206 (5th Cir.1997). Federal regulations require an employee who believes that he has been discriminated against on the basis of race, color, religion, sex, national origin, age, disability, or genetic information to initiate contact with an EEO counselor within forty-five days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within forty-five days of the effective date of the action. 29 C.F.R. § 1614.105(a)(1). "Failure to notify the EEO counselor in timely fashion may bar a claim, absent a defense of waiver, estoppel, or equitable tolling." *Pacheco v. Rice*, 966 F.2d 904, 905 (5th Cir.1992). The employee bears the burden of establishing waiver, estoppel, or equitable tolling to circumvent this EEO requirement. *Teemac v. Henderson*, 298 F.3d 452, 454, 457 (5th Cir.2002).

On August 6, 2018, Plaintiff had constructive knowledge that Mr. Bullock had been selected by lateral reassignment to the Division Chief position. Exhibit A-3, Plaintiff's Clarification Letter and Attachments, at Bates DHS0015; Exhibit G, Plaintiff's Deposition, p. 47, lines 3-8. And prior to that time, on May 11, 2018, Plaintiff learned that the competitive vacancy announcement for the Division Chief position was canceled. Exhibit A-1, Bates DHS0004. Yet Plaintiff waited until November 28, 2018, to contact an EEO counselor to claim that his non-selection to the Division Chief position was because of racial discrimination. Exhibit A-1,

11

Plaintiff's Individual Complaint of Employment Discrimination, Bates DHS0003; Rec. Doc. 1, Complaint, ¶ 13.

Plaintiff argues that his 45-day time period began when Mr. Bullock, the selectee, actually reported for duty as the Division Chief on October 15, 2018, and not when he learned of Mr. Bullock's selection. Exhibit A-3, at Bates DHS0016. Although the announcement was made on August 6, 2018, according to Plaintiff, it wasn't official. *Id.*, at Bates DHS0015. Plaintiff reasons that because the August 6th announcement was short on details about the selection – such as, whether Mr. Bullock had actually accepted the position or if Mr. Bullock had been properly vetted or if Mr. Bullock had been approved by headquarters – this notice could not have triggered the 45-day time limitations. *Id.*

Further, and relying on 29 C.F.R. § 1614.105(a)(1), Plaintiff reasons that the triggering event of a non-selection, as a "personnel action," is the effective dated of the successful applicant's official promotion. Rec. Doc. 23, Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, pp. 10-17. In support of his novel theory, Plaintiff cites two non-binding cases, *Jakubiak v. Perry*, 101 F.3d 23 (4th Cir. 1996) and *Vasser v. McDonald*, 228 F. Supp. 3d 1 (D.D.C. 2016)) which are factually distinguishable. *Id.*, pp. 15-16. In both of these cases, the plaintiffs themselves were candidates for the promotions at issue.

Plaintiff is asking the Court to accept a broad reading of "personnel action" in the regulation. A "personnel action' should relate somehow to the individual seeking redress through the EEO. Here, Plaintiff did not suffer a personnel action nor could he have experienced a personnel action (a non-selection) because he did not apply for the lateral reassignment. Exhibit G, Plaintiff's deposition, p. 12, lines 12-16.

The Fifth Circuit has held that the limitations period on an employment discrimination claim "begins to run from the time the complainant knows or reasonably should have known that the challenged act has occurred." *Vadie v. Mississippi State Univ.*, 218 F.3d 365, 371 (5th Cir.2000); *see also Delaware State Coll. v. Ricks*, 449 U.S. 250, 259 (1980) (holding, in a challenge to a denial of tenure, that the limitations period commenced when the tenure decision was made and was notified, not when his employment actually ended). The admitted facts confirm that Plaintiff failed to contact an EEO counselor within the proscribed time period. Thus, Plaintiff's failure to contact an EEO counselor within 45 days of his knowledge of non-selection prohibits judicial review of his non-selection claim under Title VII. *Smith v. Johnson*, 647 F. App'x 377, 378 (5th Cir. 2016) ("The 45 days run from the date [plaintiff] knows that an adverse employment action occurred, *not* from when he first perceives discriminatory animus.").

### A. Equitable Tolling

Failure to notify the EEO counselor in timely fashion may bar a claim, absent a defense of waiver, estoppel, or equitable tolling. *Henderson v. United States Veterans Admin.*, 790 F.2d 436, 439–40 (5th Cir, 1986). The limitations period begins to run when a plaintiff knows or reasonably should know that the discriminatory act has occurred, not when he first perceives that a discriminatory motive caused the act. *See Pacheco v. Rice*, 966 F.2d 904, 906 (5th Cir. 1992) *citing Merrill v. Southern Methodist University*, 806 F.2d 600, 605 (5th Cir. 1986). "To allow plaintiffs to raise employment discrimination claims whenever they begin to suspect that their employers had illicit motives would effectively eviscerate the time limits prescribed for filing such complaints." *Pacheco*, 966 F.2d at 906.

In May of 2018, Plaintiff received notice of the cancellation of the vacancy announcement and was informed that it would be re-posted at a later date. Exhibit A-3, Plaintiff's Clarification

13

Letter and Attachments, Bates DHS0014. However, on August 6, 2018, Plaintiff learned that Mr. Bullock had been selected for the Division Chief position through a lateral transfer. *Id.* Plaintiff knew Mr. Bullock. Exhibit G, Plaintiff Deposition, p. 14, lines 23-25. And through EEO and No Fear Act training and the EEO poster, Plaintiff was aware of the 45-day time limitation to seek EEO counseling. Exhibit A-3, Plaintiff's Clarification Letter and Attachments, Bates DHS0017. Accordingly, Plaintiff is unable to present a plausible argument that would excuse his failure to comply with the 45-day pre-complaint processing requirement of 29 C.F.R. §1614.105(a)(1).

## IV. <u>PLAINTIFF'S CLAIM OF RACIAL DISCRIMINATION MUST FAIL</u>

Alternatively, even if Plaintiff can demonstrate that he timely contacted an EEO counselor, his disparate treatment claim nonetheless fails because he cannot make a prima facie showing of discrimination. And even if he could meet his threshold burden, Plaintiff cannot show that defendant's proffered reasons for selecting Christopher Bullock are not true but instead a pretext for intentional discrimination.

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer to discriminate against an employee "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). Intentional discrimination may be proven by either direct or circumstantial evidence. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir.2000). When there is no direct evidence of discrimination, a claim will be analyzed under the familiar McDonnell Douglas burden-shifting framework. *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir.2007); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Because there is no direct evidence of discrimination, the *McDonnell Douglas* framework applies here.

Accordingly, the plaintiff alleging discrimination must first make a prima facie showing that: "(1) he belongs to a protected class; (2) he applied for and was qualified for a position for which applicants were being sought; (3) he was rejected; and (4) a person outside of his protected class was hired for the position." *Burrell*, 482 F.3d at 412. If the plaintiff succeeds in making the prima facie case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the employer's action. *McDonnell Douglas*, 411 U.S. at 802. If the employer offers a nondiscriminatory reason, the burden shifts back to the plaintiff to show that "the defendant's proffered reason is not true, but instead is a pretext for intentional discrimination." *Price v. Fed. Exp. Corp.*, 283 F.3d 715, 720 (5th Cir.2002); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

### A. Plaintiff cannot make a prima facie showing of disparate treatment

Plaintiff cannot demonstrate prongs two or three of the prima facie case. Plaintiff did not apply nor was he qualified for a lateral reassignment to the Division Chief position. Exhibit G, Plaintiff's deposition, p. 12, lines 12-16; p. 13, lines 12-16. Because he did not apply for the lateral reassignment, Plaintiff cannot show that he was rejected for the position. Accordingly, Plaintiff cannot make a prima facie showing of discrimination and his claim of racial discrimination fails.

### B. Plaintiff cannot demonstrate pretext

Alternatively, Plaintiff's discrimination claim fails because he cannot demonstrate pretext. If Plaintiff could establish a prima facie case, the burden shifts to USBP to proffer legitimate, nondiscriminatory reasons for selecting Christopher Bullock. This burden is one of production, not persuasion and involves no credibility assessments. *Russell v. McKinney Hop. Venture*, 235 F.3d 219, 222 (5th Cir. 2000).

Here, Chief Bovino found Mr. Bullock to have solid experience across four Border Patrol Sectors over a 20 year period, a significant portion of which was spent in crucial leadership positions.  Exhibit B-2, Recommendation for Vacant GS-14 Division Chief, New Orleans Sector, Bates DHS009.  Mr. Bullock's in-depth knowledge of Tucson Sector Intelligence initiatives, including license plate readers, cyber intelligence, and human source development, parlayed well into the New Orleans Sector's strategy of targeting bad things and people originating from the Southwest border.  *Id.*

Chief Bovino's request to laterally reassign Mr. Bullock from Tucson Sector to the vacant Division Chief at New Orleans Sector was approved by both Richard Hudson, Acting Chief Law Enforcement Operations Directorate at Headquarters, and Scott Luck, Acting Deputy Chief of USBP at Headquarters.  *Id.*; *see also* Exhibit B, Declaration of Gregory Bovino, ¶ 10.

A plaintiff may demonstrate pretext by "showing that the employer's proffered explanation is false or unworthy of credence."  *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir.2003) (internal quotation marks omitted).  "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action."  *Id.*  Alternatively, a "fact finder can infer pretext if it finds that the employee was 'clearly better qualified' (as opposed to merely better or as qualified) than the employees who are selected."  *EEOC v. La. Office of Cmty. Servs.*, 47 F.3d 1438, 1444 (5th Cir.1995); *see also Price*, 283 F.3d at 723.

Although he did not apply for a lateral reassignment, Plaintiff claims that he was better qualified to be the Division Chief than Mr. Bullock because he, Plaintiff, had served as a permanent PAIC at two different station – in New Orleans station and in New Orleans Intelligence unit.  Exhibit G, Plaintiff's Deposition, p. 14, lines 12-25; p. 15, lines 1-25; p.16, lines 1-2.  Plaintiff believes Mr. Bullock's previous positon as a Deputy Patrol Agent in Charge did not have as many

responsibilities as Plaintiff has had because Mr. Bullock would not have been a final authority on some decisions but would have to go to his supervisor, the patrol Agent in Charge. *Id.* at p. 15, lines 10-14.

Mr. Hudson disagrees with Plaintiff's self-serving belief that he possessed superior qualifications for the Division Chief position than Mr. Bullock. While Mr. Williams had reached a higher rank than Mr. Bullock, Mr. Hudson considers Mr. Bullock's experience as the DPAIC at Imperial Beach station and the Tucson Intelligence unit to be considerably more complex and valuable than Mr. Williams' experience as PAIC in the New Orleans sector. Exhibit D, Declaration of Richard Hudson, ¶ 10. First, Mr. Williams supervised fewer than twenty employees and operations were only conducted for forty hours per week. *Id.* Mr. Bullock supervised hundreds of employees and the operations were conducted twenty-four hours a day, seven days a week. *Id.* Second, Imperial Beach and Tucson were two of the USBP's busiest areas and were known for progressive law enforcement techniques and strategies. *Id.*

Mr. Luck also disagrees with Plaintiff's self-assessment. Based on his experience with the USBP, Mr. Luck believes that the professional experience of a DPAIC at the Imperial Beach Station, like that of Mr. Bullock's, makes a candidate objectively better suited for promotion than a candidate with experience as a PAIC in the New Orleans Sector. Exhibit C, Declaration of Scott Luck, ¶ 6. The heart of the USBP mission and its most difficult obstacles take place on the Southwest Border. *Id.* The bulk of the USBP apprehensions, people and contraband, occur on the Southwest Border. *Id.* It is also where Border Patrol Agents are most likely to face dangers from the drug cartels or other criminal elements. *Id.* The Imperial Beach DPAIC is supervising hundreds of agents at a station who put themselves in danger every day in furtherance of the USBP mission. *Id.* The Imperial Beach station operates 24 hours a day, seven days a week. *Id.* To

17

successfully serve in this position, an agent must have a strong grasp of the USBP's strategic vision and be able to promptly and appropriately respond to the emergencies inherently attached to the position. *Id.* In addition to being operationally sound, the Imperial Beach DPAIC must be able to appropriately handle the issues that naturally arise when managing a large workforce—the majority of which are members of a collective bargaining unit. *Id.* A PAIC in the New Orleans Sector simply does not face the same operational or personnel-related complexities. *Id.* A PAIC in the New Orleans Sector supervises fewer than 20 employees, and the operations, based primarily on its geographic location and budget constraints, are far less complex than those on the Southwest Border. *Id.* The New Orleans Sector only received funding to staff an 8-hour day/ 5-day a week workweek. *Id.* Therefore, the pay grades of the two positions are reflective of the complexity and responsibility of the positions. *Id.* The Agency grades the Imperial Beach DPAIC Position as a GS-14 and grades the New Orleans PAIC position as a GS-13. *Id.*

To show that Plaintiff was "clearly better qualified" than Christopher Bullock and raise a fact question as to whether discrimination was a factor in Defendant's hiring decisions, Plaintiff must present evidence from which a jury could conclude that "no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Deines v. Texas Dep't of Protective & Regulatory Servs.*, 164 F.3d 277, 280–81 (5th Cir.1999). "[U]nless the qualifications are so widely disparate that no reasonable employer would have made the same decision," *id*., any "differences in qualifications are generally not probative evidence of discrimination." *Moss v. BMC Software, Inc.*, 610 F.3d 917, 923 (5th Cir. 2010) citing *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 357 (5th Cir.2001). Thus, "the bar is set high for this kind of evidence." *Id*. Plaintiff cannot meet this high burden. Therefore, Plaintiff's discrimination claim must fail

## V. CONCLUSION

Based upon the foregoing, Plaintiff's discrimination claim fails and USBP is entitled to judgment as a matter of law. Plaintiff's suit should be dismissed at his costs.

Respectfully Submitted,

**PETER G. STRASSER**
**UNITED STATES ATTORNEY**

**BY:**   *s/Sandra Ema Gutierrez*
**SANDRA EMA GUTIERREZ**
Assistant United States Attorney
LA Bar #17888
650 Poydras Street, Suite 1600
New Orleans, Louisiana 70130
Telephone: (504) 680-3000
Sandra.gutierrez@usdoj.gov