**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**RANDOLPH WILLIAMS III**

        **Plaintiff,**

  **v.**

**ALEJANDRO MAYORKAS, SECRETARY,**
**DEPARTMENT OF HOMELAND**
**SECURITY**

        **Defendant.**

**CIV. NO. 2:19-CV-12841-GGG-DMD**
**Consolidated with:**
**CIV. NO. 2:19-CV-14234**

**This Document Pertains to No. 19-14234**

**PLAINTIFF'S RESPONSE IN OPPOSITION**
**TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

For the following reasons, plaintiff Jon P. Joyner partially opposes the motion for summary

judgment (Doc. 109) filed by defendant Alejandro Mayorkas in his official capacity as Secretary

of the Department of Homeland Security and representative of the United States Border Patrol.

Specifically, Mr. Joyner *opposes summary judgment* on the following claim:

> Under Title VII, disparate-treatment discrimination based on race concerning Mr. Joyner's
>
> non-selection for the position of Division Chief of New Orleans Sector on or about October
>
> 14, 2018 (advertised via announcement no. USBP-IMP-10168092-JRB) (the **"Division**
>
> **Chief"** claim), as asserted by plaintiff in his complaint, Doc. 1 at ¶¶ 106-119.

Mr. Joyner does not oppose summary judgment on his ancillary claims for disparate-treatment

retaliation (*see* Doc. 1 at ¶¶ 120-124).

**SUMMARY OF THE OPPOSITION**

This case has been ordered consolidated with the lead case, *Williams v. Mayorkas*, No.

2:19-CV-12841 (*see* Doc. 95).  The plaintiff here, Jon P. Joyner, is a former U.S. Marine who

joined the United States Border Patrol in 1996 after his honorable discharge and then successfully

served as a USBP agent until his retirement in August 2021.  The plaintiff in the lead consolidated case is Randy Williams, himself a veteran of the U.S. Air Force who continues to serve as a USBP agent today.  At the relevant time of this case, both men held the GS-13 supervisory rank of "Patrol Agent in Charge" of different USBP stations within USBP's "New Orleans Sector" – the largest organizational unit for the Southern Coastal United States outside of USBP's national headquarters in Washington D.C.

Mr. Joyner and Mr. Williams are both black men.  In April 2018, both applied for the next promotion in their career progression, the "Division Chief" of New Orleans Sector, which is a supervisory GS-14 position.  The man who would select someone to fill that job was Gregory Bovino (white), who USBP headquarters had just reassigned to New Orleans Sector as its Chief Patrol Agent a few weeks before Mr. Joyner and Mr. Williams had applied for the open position.

For all practical purposes, the very first decision that Mr. Bovino made after he entered on duty was to pass over Mr. Joyner and Mr. Williams for the Division Chief position and, instead, select an objectively less qualified comparator, a man named Christopher Bullock (white).  The facts of Mr. Joyner's prima facie case of non-selection, along with Mr. Bovino's pretextual reasons justifying his selection, are explored in depth below.

But these facts will already be very familiar to the Court, because USBP already filed a full-throated motion for summary judgement to dismiss Mr. Williams's **identical** race-discrimination claim over a year ago in December 2020 (*see* Doc. 61).  Mr. Williams timely opposed USBP's motion by submitting 36-pages of opposition briefing and 25 separate exhibits totaling 361 pages of documentary and deposition-testimony evidence.  This Court denied USBP's motion for summary judgment on September 29, 2021 (*see* Doc. 94).

Apparently undeterred, USBP now files a virtually identical motion for summary judgment against Mr. Joyner arguing his identical race-discrimination claim should be dismissed even though this Court has already ruled that Mr. Williams's consolidated claim survives and is entitled to jury trial.  USBP offers no explanation in its motion for summary judgment for why it has engaged in this wasteful litigation.  Nor does USBP appear to even acknowledge in its motion that the Court already rejected USBP's arguments in the *Williams* case.

Nevertheless, in this case, on this motion, Mr. Joyner easily makes his *prima facie* case of race-based discrimination.  Mr. Joyner has produced at least as much evidence of pretext as Mr. Williams did more than a year ago when this Court denied USBP's identical motion for summary judgment.  Moreover, Mr. Joyner brings to the table several pieces of evidence which bolsters his case even beyond what this Court already determined was sufficient in *Williams* to survive summary judgment.

For all these reasons, Mr. Joyner respectfully asks the Court to deny defendant's motion for summary judgment with respect to plaintiff's disparate-treatment discrimination claim. Instead, Mr. Joyner asks that this consolidated case be permitted to go to jury trial on its scheduled date of May 23, 2022.

## MATERIAL FACTS

In this consolidated case, plaintiff Jon Joyner incorporates here all facts recited in plaintiff Randolph Williams's *Rule 56.2 Counter-Statement of Disputed Material Facts* (Doc. 75-1 (a copy of which is attached as **Exhibit W**)) and *Response in Opposition to Defendant's Motions for Summary Judgment* (Doc. 75).  However, for ease of reference, Mr. Joyner summarizes here the most important facts of the case – including the additional material facts adduced during Mr.

Joyner's discovery period after the Court denied USBP's prior motion for summary judgment in *Williams*.

**A.      USBP's Leadership Structure and Mr. Joyner's Work History**

Jon Joyner is a black man.  He is married and, today, lives with his wife and children in Arizona.  Mr. Joyner is a veteran of the U.S. Marine Corps and worked as a Border Patrol agent with USBP from 1996 until his retirement in 2021.[1]  This case centers on Mr. Joyner's 2018 application and non-selection for the position of Division Chief of USBP's "New Orleans" Sector located in New Orleans.[2]  During that 2017-2018 time period, Mr. Joyner was given the highest possible performance rating on his annual performance review ("achieved excellence").[3]  At the time, Mr. Joyner had never been formally disciplined for any reason by any supervisor in his entire career.[4]

The leadership structure of New Orleans Sector is the same as for all of USBP's other sectors.[5]  The top decision-maker is the Sector's Chief Patrol Agent ("CPA").[6]  The executive officer who assists the CPA is the Deputy Chief Patrol Agent ("DCPA").[7]  Third in command is the Division Chief of Law Enforcement Operations, which is one of three division chiefs assigned to each sector (the other Division Chiefs having responsibility for "operational support" and "mission readiness").[8]  Reporting to the Division Chief of Law Enforcement Operations is the Patrol Agent in Charge ("PAIC") of each of the "Stations" within the Sector.[9]  Each Station

---

[1] *See* Plaintiff's Counter-Statement of Disputed Material Facts (hereinafter "CSDMF") at ¶¶ 1-3.
[2] *See* CSDMF at ¶¶ 5-8.
[3] *See* CSDMF at ¶ 18.
[4] *See* CSDMF at ¶ 77.
[5] *See* Doc. 1 at ¶¶ 31-33.
[6] Doc. 1 at ¶ 34.
[7] Doc. 1 at ¶ 35.
[8] *See* Doc. 1 at ¶ 36.
[9] *See* Doc. 1 at ¶ 44.

represents the front-line law enforcement unit for that particular, geographic area.[10]  Visually, the structure of USBP's sector headquarters looks like this:



Chief Patrol Officer

Deputy Chief Patrol Officer

Division Chief Operations        Division Chief Programs        Division Chief Readiness

Patrol Agent in Charge (each Station)

During his career, Mr. Joyner served in many supervisory positions throughout USBP on multiple US borders.[11]  From March 2018 through approximately April 2020, Mr. Joyner served as the GS-13 PAIC of Gulfport Station located in Gulfport, MS within New Orleans Sector, and was responsible for all front-line law enforcement actions throughout Mississippi.[12]  From August 2017 to March 2018, Mr. Joyner served as the GS-14 Division Chief of Law Enforcement Operations for "Ramey" Sector located in Puerto Rico and was responsible for all interdiction and enforcement actions throughout Puerto Rico, the U.S. Virgin Islands, and approximately 6,000 square miles of land and water area.[13]  From November 2016 through August 2017, Mr. Joyner served as the GS-13 PAIC of Ramey Station within Ramey Sector, as the Station's front-line law enforcement officer for all of Puerto Rico and the Virgin Islands.[14]  From September 2012 through

---

[10] *See* Doc. 1 at ¶ 43.
[11] Within USBP, an agent's pay based on the familiar "General Schedule" scale is not dependent solely on rank, but on rank plus the number of agents being supervised in the position.  Thus, for instance, Mr. Joyner was paid as a GS-14 employee when he was Watch Commander of Tucson Station in Arizona because of the larger number of employees he supervised, compared to Mr. Joyner's pay as a GS-13 PAIC of Gulfport station, which is a higher ranking position within USBP, but one that happens to supervise fewer employees.
[12] *See* CSDMF at ¶ 27.
[13] *See* CSDMF at ¶ 22.
[14] *See* CSDMF at ¶ 21.

November 2016, Mr. Joyner served as the GS-14 Watch Commander for the Tucson Border Patrol Station, supervising over 120 USBP agents and supervisors, in one of the busiest geographic territories within the USBP.[15]   During that same time, Mr. Joyner also served as the Acting Assistant PAIC of Tucson Station, supervising over 600 agents and other supervisory personnel on the Southwest border.[16]

Fast-forwarding to 2018: Hurricane Maria severely impacted Puerto Rico in late 2017, and Mr. Joyner took a position as the PAIC of Gulfport Station in Mississippi to relocate his wife and children from the disaster area.[17]   In early 2018, the CPA of New Orleans Sector – a man named John Richards – had just retired.[18]   The Deputy CPA at the time – a man named Joe Banco – began serving as the Acting CPA.[19]

On or about March 30, 2018, CBP announced a permanent position for Division Chief of Programs (GS-1896-14) via USAJobs.com.[20]   Mr. Joyner applied for the position.[21]   Mr. Joyner was determined to be "qualified" for the Division Chief position sufficient that his name was referred to New Orleans Sector leadership for consideration.[22]

The comparator in this case who was ultimately selected for the Division Chief position, Christopher Bullock (white), did not competitively apply for the position through the competitive announcement.[23]

---

[15] *See* CSDMF at ¶ 26.
[16] *See* CSDMF at ¶ 21.
[17] *See* Doc. 1 at ¶¶ 57-63.
[18] *See* CSDMF at ¶ 31.
[19] *See* CSDMF at ¶ 31.
[20] *See* CSDMF at ¶ 5.
[21] *See* CSDMF at ¶ 6.
[22] Certificate of Eligibles for Division Chief Announcement (a copy of which is attached as **Exhibit V**).
[23] *See* CSDMF at ¶ 41.

**B.      Mr. Joyner and Mr. Williams Are Selected to Interview for Division Chief**

At the time Mr. Joyner applied for the Division Chief vacancy, Acting CPA Banco utilized a "scoring matrix" to compare the candidates who had applied for the promotion against each other.[24]  Based on that scoring, six candidates were eligible for interview, including Mr. Joyner.[25] The interviewees were Jon Joyner (black), Mr. Williams (black), Jose Rodriguez (Hispanic), Samuel Rodriguez (Hispanic), Robert Rivet (white), and Eric Billings (white).[26]

Because the comparator in this case, Christopher Bullock, did not competitively apply for the position through the competitive announcement, he was never scored against Mr. Joyner or Mr. Williams (or any other of the candidates who were selected to be interviewed).

**C.      Objective Scoring Proves Mr. Joyner Was Clearly More Qualified than Mr. Bullock**

USBP utilizes a particular type of scoring matrix for promotions at the Headquarters level known as a "Kepner-Tregoe Exercise."[27]  This particular scoring matrix was used by a later Acting CPA of New Orleans Sector – a man named Michael Harrison who served after USBP relocated Mr. Bovino away from New Orleans Sector in the wake of these lawsuits – to compare candidates for a subsequent Division Chief position at New Orleans Sector that was announced in February 2020.[28]  During depositions in this case, Mr. Bullock scored himself on the Exercise.[29]  Bullock awarded himself only 22 points.[30]  For comparison purposes, Mr. Harrison scored Mr. Williams during his deposition.[31]  Mr. Harrison awarded Mr. Williams 29 points.[32]  Just like Mr. Bullock

---

[24]   *See* CSDMF at ¶ 49.
[25]   *See* CSDMF at ¶¶ 79-80.
[26]   Scoring Matrix used by Banco and Pedregon for Division Chief Interviewee Selection (a copy of which is attached as **Exhibit S**).
[27]   *See* CSDMF at ¶ 81.
[28]   *See* Exhibit W, Doc. 75-1 at ¶ 91.
[29]    *See* Exhibit W, Doc. 75-1 at ¶ 93.
[30]   *See* Exhibit W, Doc. 75-1 at ¶ 93.
[31]   *See* Exhibit W, Doc. 75-1 at ¶ 92.
[32]   *See* Exhibit W, Doc. 75-1 at ¶ 92.

did, Mr. Joyner also scored himself on the Exercise for purposes of this case.[33]  Based on his objective work history as of 2018, Mr. Joyner scored 41 points – nearly double that of Mr. Bullock.[34]  Again, as the Exercise is objective in nature, and awards points for past and current work history.

Bizarrely, despite the fact that Mr. Bullock had zero permanent experience at the PAIC level, as a Division Chief, in any other position at a Sector Headquarters, or on the Southern or Coastal Borders, Mr. Bovino testified during his deposition he believed Mr. Bullock was the most qualified agent throughout the entire USBP for the job.[35]  But, when pressed during deposition, Mr. Bovino admitted that he did not know who the best qualified candidate for the Division Chief position was because he did not participate in the original process to select the interviewees for the Division Chief position.[36]  When questioned during his own deposition, Mr. Bullock gave a more honest answer:  he did not know if he was the most qualified man for the job or not, and he admitted Mr. Joyner and Mr. Williams may have been more qualified.[37]  In fact, Mr. Bullock testified he only applied for the job because Mr. Bovino asked him to do so.[38]

Scoring and points aside, it is undisputed that Mr. Joyner held higher seniority positions than Mr. Bullock at the time of the Division Chief announcement in the case.  Mr. Joyner was the current, permanently assigned Patrol Agent in Charge of Gulfport Station.[39]  Mr. Bullock had never held a permanent PAIC position of a Station before and had only served as a Deputy PAIC.[40]  Mr.

---

[33]  *See* CSDMF at ¶ 85.

[34]  *See* CSDMF at ¶ 85.

[35]  Deposition of Gregory Bovino in *Williams*, November 30, 2020, at 173:9-174:10 (excerpts of which are attached as **Exhibit I**).

[36]  Bovino Dep. in *Williams,* at 92:2-19.

[37]  Deposition of Christopher Bullock, November 23, 2020, at 183:3-21 (excerpts of which are attached as **Exhibit L**).

[38]  Bullock Dep. at 50:2-52:14.

[39]  *See* CSDMF at ¶ 7.

[40]  *See* Bullock's Memorandum and Resume, (a copy of which is attached as **Exhibit P**).

Joyner was the former Division Chief of Operations at Ramey Sector.[41]  Mr. Bullock had zero experience whatsoever as a Division Chief or at a Sector Headquarters in any other capacity.[42]  Mr. Joyner had served tours of duty on three different US borders – the Southwest, Southern, and Coastal borders[43] – whereas Mr. Bullock had only served on the Southwest border.[44]  Otherwise, the men had roughly similar backgrounds: neither held a college degree, and neither held any positions permanently assigned to USBP headquarters in Washington.[45]

**D.    Mr. Bovino Misrepresented His Reasons for Cancelling the Division Chief Posting**

Emails produced during discovery prove that Mr. Bovino recruited Mr. Bullock for the Division Chief position before he even entered on duty as the Chief Patrol Agent.  On May 7, Mr. Bullock emailed his wife about his plans to apply for the job (although Mr. Bullock would not do so for another few weeks).[46]  The next day, on May 8, Acting CPA Banco asked Mr. Bovino if he would like to participate in the interview process for Mr. Joyner, Mr. Williams, and the other candidates who had already applied for the job.[47]  Mr. Bovino immediately asked Mr. Banco to delay interviews until a later date.[48]  Mr. Banco indicated he was reticent to delay interviews for the position, and so on May 9, Mr. Bovino contacted the third-highest ranking USBP official within the organization, the "Chief of Law Enforcement Operations Directorate" at Headquarters, to receive permission to cancel the application.[49]  The Directorate Chief at the time was a man

---

[41] *See* CSDMF at ¶ 22.

[42] *See* Exhibit P, Bullock's Memorandum and Resume.

[43] *See* CSDMF at ¶ 21.

[44] *See* Exhibit P, Bullock's Memorandum and Resume.

[45] *See* Jon Joyner's Resume at time of Division Chief Application (a copy of which is attached as **Exhibit 2**, attached to the Sworn Declaration of Jon P. Joyner, **Exhibit U**) & Exhibit P, Bullock's Memorandum and Resume.

[46] Email thread between Christopher Bullock and Susan Bullock about Lateral Memo (a copy of which is attached as **Exhibit M**).

[47] Email thread between Banco, Bovino, and Hudson (a copy of which is attached as **Exhibit N**).

[48] Exhibit N at 3-4.

[49] Exhibit N at 3.

named Richard Hudson.

Mr. Bullock testified that he only considered applying for the Division Chief job because Mr. Bovino asked him to do so, and so we now know the true reason Mr. Bovino wanted to cancel the certification was because he had already recruited his preferred candidate – Mr. Bullock (white).  However, instead of stating his true intentions, Mr. Bovino gave Mr. Hudson a completely pretextual reason:

> Rich,
>
> Gave it some thought, and **I think it would be best to cancel the list and wait 90 days.** Rivet is acting Division Chief already and he can continue in that role. **I don't think the announcement received the attention it should've, and we will make more of an effort to recruit the right pool of candidates.** How do I go about canceling the list at this point?[50]

Based on that reason, Mr. Hudson agreed.  On or about May 10 or 11, after talking with Bovino, Acting CPA Banco cancelled the application.[51]  At some point thereafter, Mr. Bovino told Mr. Joyner he would re-announce the Division Chief position at a later date.  Based on that misrepresentation, Mr. Joyner did not submit an "memorandum" request for the job like Mr. Bullock eventually did.[52]  Of course, had Mr. Bovino honestly told Mr. Joyner he was accepting memoranda requests, Mr. Joyner could have applied, but then Mr. Bovino would not have been able to justify his selection of Mr. Bullock compared to Mr. Joyner's far better qualifications.

Four days later, on May 14, 2018, human resources staff for New Orleans Sector contacted Mr. Bovino and asked when he would like to re-announce the Division Chief position.[53]  He never responded.

---

[50]  Exhibit N at 2.
[51]  *See* Exhibit W, Doc. 75-1 at ¶ 22.
[52]  *See* CSDMF at ¶ D-19.
[53]  Email thread between Carol Kerr-Borne, Bovino, and Hudson at 2 (a copy of which is attached as **Exhibit X**).

On May 23, Mr. Bullock emailed Mr. Bovino a draft of his memorandum requesting promotion to the Division Chief position.[54]  On May 24, Mr. Bovino and Mr. Bullock traded several emails discussing the best language to use for the memorandum request so that Headquarters would approve Mr. Bovino's selection of Mr. Bullock.[55]

At no time did Mr. Bovino tell either Acting CPA Banco or Chief Hudson that Mr. Bovino secretly wanted to recruit Mr. Bullock for the Division Chief position.  At no time did Mr. Bovino admit that his proffered explanation for the cancellation—that he wanted to recruit a large pool of applicants—was mere pretext for his desire to recruit Bullock.

During the initial EEO investigation into Mr. Williams's claim of race-based discrimination, EEO investigators asked Mr. Bovino by email how Mr. Bullock could have learned about the Division Chief opening in the first place.[56]  Mr. Bovino offered no explanation and did not disclose that he, himself, secretly recruited Mr. Bullock to apply for the position.[57]

Fast-forwarding a few weeks, Mr. Bovino and Mr. Bullock had agreed that Mr. Bullock would wait to formally submit his request for promotion until after Mr. Bovino entered on duty.[58]  Mr. Bovino entered on duty on July 9, 2018.  That same day, Mr. Bullock emailed Mr. Bovino his official request to be promoted to the Division Chief vacancy at New Orleans Sector.[59]  That same day, Mr. Bovino emailed Chief Hudson and others, formally requesting permission to promote Mr. Bullock to the Division Chief position.[60]  Once again, at no time did Mr. Bovino indicate to Mr.

---

[54] Email between Bovino and Bullock Discussing Memo Containing Confederate Meme at 3 (a copy of which is attached as **Exhibit O**).

[55] *See* Exhibit O.

[56] Email between Ahmad Zadah and Bovino (a copy of which is attached as **Exhibit Y**).

[57] *See* Exhibit Y.

[58] *See* Exhibit W, Doc. 75-1 at ¶ 74 (citing to Bullock Dep. at 148:10-19).

[59] *See* Exhibit W, Doc. 75-1 at ¶ 75.

[60] Bovino's July 9 Lateral Reassignment Request Email to Hudson (a copy of which is attached as **Exhibit Z**).

Hudson or anyone else that he had secretly recruited Mr. Bullock to apply for the position or coached him on the preferred language to use in his memorandum.

Ultimately, Mr. Bovino never re-announced the Division Chief position after he explicitly told Mr. Hudson and Mr. Joyner that he would do so.[61]  Mr. Bovino never told anyone at New Orleans Sector that he was accepting private memorandum for the Division Chief promotion.[62] During his deposition, former Acting CPA Banco testified that when Bovino revealed to him his intent to select Bullock over Williams, Joyner, and the other interviewees, Mr. Banco strongly encouraged Mr. Bovino to at least compare the credentials of the potential candidates first.[63]  Mr. Banco testified that Mr. Bovino refused.[64]  During his testimony, Mr. Banco candidly admitted that it was clear Mr. Bovino favored Mr. Bullock during the selection process.[65]

During his deposition, Mr. Bovino admitted that he, in fact, selected Mr. Bullock over Mr. Joyner for the Division Chief promotion.[66]  Mr. Bovino admitted that he could have selected Mr. Joyner for the position had he wanted to, but he preferred Bullock and so he chose him instead.[67]

Finally, at the time of Mr. Bullock's selection, it was USBP policy that a selecting official chose an alternate candidate for promotion in cases where the primary candidate could not clear the vetting process for promotion, or otherwise declined the promotion after the fact.[68]  Mr. Bovino admits during his deposition that he did not select an alternate for the Division Chief promotion,

---

[61]  Bovino Dep. in *Williams* at 82:17-20.
[62]  Bovino Dep. in *Williams* at 156:17-21.
[63]  Deposition of Joseph Banco, November 16, 2020, at 86:21-89:7 (excerpts of which are attached as **Exhibit K**).
[64]  *Id.*
[65]  Banco Dep. at 165:8-15 (**Q** . . . .you do admit that you believe, now that you've looked at this evidence, that Mr. Bovino clearly favored Mr. Bullock and that's why he selected Mr. Bullock over Mr. Joyner and Mr. Williams for the division chief of operational programming position in New Orleans sector. Correct? **A** Correct.).
[66]  Bovino Dep. in *Williams* at 267:5-268:10.
[67]  *Id.*
[68]  Deposition of Brian Hastings in *Williams*, November 6, 2020, at 89:13-90:11 (excerpts of which are attached as **Exhibit Q**).

despite the fact that Mr. Joyner (and Mr. Williams) were objectively qualified for the position.[69]

**E.**     **Mr. Bullock Sent Mr. Bovino Racially Charged Emails During the Time in Question**

Referring back to the email chain between Mr. Bovino and Mr. Bullock on May 23, 24, and 25, 2018, Mr. Bullock concluded the correspondence by creating and sending Mr. Bovino a "meme" after the two had finalized their plans to select Mr. Bullock as the next Division Chief of New Orleans Sector.[70]   Bullock's meme suggested Mr. Bovino was a confederate war general who was coming to rescue the rank-and-file USBP field agents of New Orleans Sector—who were depicted as confederate soldiers rallied around a confederate battle flag—from the current New Orleans Sector leadership, who were depicted as beleaguered union soldiers. **These emails are attached as Exhibit O.**

When Bovino received the email, he immediately responded "Oh jeez, DELETE!!!!!"[71] but did not reprimand Bullock for sending the racially charged email or inquire why he had sent it.[72]   During deposition, Mr. Bullock testified he sent the email to Bovino because Bovino was a "history buff" who would think the email was funny.[73]   Mr. Bullock admitted the emails were inappropriate,[74] and stated that someone could look at the email and find it to be racially charged.[75] During deposition, Mr. Bovino likewise admitted the email was inappropriate saying it was a waste of government resources and "bogus" and "worthless",[76] but also denied that he perceived it as racially charged.[77]   Mr. Bovino testified he did not believe the racially charged email warranted

---

[69]   Bovino Dep. in *Williams* at 166:8-168:3.
[70]   *See* Exhibit O, Email between Bovino and Bullock Discussing Memo Containing Confederate Meme.
[71]    *See* Exhibit W, Doc. 75-1 at ¶ 73.
[72]   *See* Exhibit W, Doc. 75-1 at ¶ 76.
[73]   Bullock Dep. at 110:17-111:16.
[74]   Bullock Dep. at 119:3-11.
[75]   Bullock Dep. at 112:24-113:4.
[76]   Bovino Dep. in *Williams* at 214:4-215:8.
[77]   Bovino Dep. in *Williams* at 241:20-25.

any further counseling, reprimand, or investigation.[78]

That is not the perspective of USBP senior decision-makers, however. During deposition, a former Directorate Chief and current Chief Patrol Agent, Brian Hastings, was shown this email chain and confirmed that not only should Mr. Bovino have disciplined or referred Mr. Bullock for investigation for sending the racially charged email, but that Hastings – now having seen the images – had the official duty to report Bullock for the misconduct.[79] During a second deposition, Mr. Hastings confirmed that he ensured Mr. Bullock was, in fact, investigated for the misconduct.

Separate and apart, when CBP lawyers identified the email during the course of document production in this case, the agency attorney actually referred Mr. Bullock for investigation for sending the racially charged email, and Mr. Bullock was in fact investigated and admonished to not use government computer equipment for such purposes.[80]

This was not the first bizarre or racially charged email that Bovino and Bullock had shared. When Mr. Bovino and Mr. Bullock previously worked together in San Diego, the men shared another meme depicting President Obama giving a State of the Union Address, with the heads of Bovino and Bullock photoshopped over the heads of the Vice President and Speaker of the House standing behind Mr. Obama.[81] During deposition, neither man could explain the point of the photograph or why it was shared.[82] Mr. Bovino admitted however that he thought so highly of the image that he kept a copy of it on his work computer to this day.[83] Later, in August 2018, after Mr. Bullock received authorization from USBP Headquarters for his promotion, he re-sent that

---

[78] Bovino Dep. in *Williams* at 220:12-224:21.
[79] Hastings Dep. in *Williams* at 113:1-114:4.
[80] *See* CBP Internal Investigation Report re Bullocks Confederate Emails (a copy of which is attached as **Exhibit AA**).
[81] Email thread between the Bullocks and Bovino containing Obama meme (a copy of which is attached as **Exhibit BB**).
[82] Bovino Dep. in *Williams* at 237:7-241:6 & Bullock Dep. at 134:2-137:23.
[83] Bullock Dep. at 126:2-25.

same image to Mr. Bovino again.  **The imagine is included in Exhibit BB.**

**F.     Mr. Bovino Claimed He Did Not Know if Mr. Joyner Was a Black Man or a White Woman**

During deposition, Mr. Bovino was asked what race and sex he perceived Mr. Joyner and Mr. Williams to be.[84]  Mr. Bovino said that he did not know.[85]  Mr. Bovino's deposition was of course long after he had met and worked with both men in New Orleans.[86]  And yet Mr. Bovino testified that he could not personally tell the men's races or sex.[87]  In a bizarre moment, Mr. Bovino testified that he did not know if Mr. Joyner was a black man or a white woman. [88]  Mr. Bovino could offer no explanation for his inability to perceive that Mr. Joyner, a man with unambiguously black skin, was in fact a black man.[89]

**G.     USBP Has No Black or African American Agents in Senior Leadership Positions of Division Chief or Above**

Mr. Bovino's admission that he has not promoted any Black or African American agents to senior leadership positions accords with the statistical makeup of USBP leadership positions generally because, statistically, USBP is segregated in senior leadership positions by race.  Black and African American agents comprise approximately 5% of all USBP agents.  Likewise, in 2018, there appear to have been zero black or African American agents who held the rank of Division Chief or above at the Sector level anywhere in the United States.[90]  In fact, several current and former USBP officials deposed in the case – including Mr. Bovino – admitted that Black and African American agents are statistically underrepresented at USBP, but no one could offer a

---

[84] Bovino Dep. in *Williams* at 31:7-46:7.
[85] *Id.*
[86] Bovino Dep. in *Williams* at 31:7-46:7.
[87] *Id.*
[88] *Id.* at 42:16-43:23.
[89] *Id.* at 37:12-39:20.
[90] Plaintiff's Complaint (Doc. 1) at ¶¶ 47-55.

cogent reason why that would be so, other than USBP apparently fails to recruit Black and African American people in the first place.[91]

## ARGUMENT

USBP repeats the same arguments here that it made in the *Williams* case: Mr. Joyner cannot demonstrate a prima facie case or produce enough evidence of pretext to create a triable issue of material fact. Respectfully to defendant, these are specious arguments. Nothing in the discovery record has improved USBP's case since this Court denied USBP's identical motion in *Williams* more than six months ago. In fact, with respect to Mr. Joyner, the record evidence has improved for plaintiff. Accordingly, USBP's motion should be denied.

### A.    All Evidence Must Be Viewed in Favor of Mr. Joyner

Summary judgment is not proper unless the evidence "reflects no genuine issues of material fact and the non-movant is entitled to judgment as a matter of law." *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). In a discrimination case, summary judgment cannot be granted when the defendant's proffered reason for non-selection is "at least as consistent with discriminatory intent as it is with nondiscriminatory intent[.] *Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004). In the Fifth Circuit, "[c]redibility determinations have no place in summary judgment proceedings because non-movants' summary judgment evidence must be taken as true." *Waste Mgmt. of Louisiana, L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (internal quotes omitted). Instead, "[w]hen state of mind is an essential element of the nonmoving party's claim, it is less fashionable to grant summary judgment because a party's state of mind is inherently a question of fact which turns on credibility." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265 (5th Cir. 1991).

---

[91] *See*, e.g., Deposition of Richard Hudson, February 17, 2022, at 95:13-97:2 (excerpts of which are attached as **Exhibit G**).

**B.      Mr. Joyner Establishes His Prima Facie Case as a Matter of Law**

Title VII of the Civil Rights Act of 1964 forbids an employer from discriminating against any employee on account of the person's race.  42 U.S.C. §2000e-2(a)(1).  An employer illegally discharges an employee based on his race when race is at least one of the factors motivating the discharge.  *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005); *cf* 42 U.S.C. § 2000e–2(m) (so providing).  In a so-called "failure-to-promote" case, when direct evidence of discrimination is not available, "a plaintiff establishes a prima facie case of race-based discrimination by demonstrating that (1) she is a member of the protected class; (2) she sought and was qualified for a position for which applicants were being sought; (3) she was rejected for the position; (4) the employer hired a person outside of the plaintiff's protected class ***or continued to seek applicants with the plaintiff's qualifications.***"  *McMullin v. Mississippi Dep't of Pub. Safety*, 782 F.3d 251, 258 (5th Cir. 2015) (emphasis added).

Alternatively, "[s]tatistical evidence is also of central importance in a disparate treatment case[,]" and an employee may prove her prima facie case statistically "if gross statistical disparities in the composition of an employer's work force can be shown."  *Pouncy v. Prudential Ins. Co. of Am.*, 668 F.2d 795, 802 (5th Cir. 1982).  Specifically, when "the statistical showing is sufficiently strong in a disparate treatment action, [an employee's] prima facie case can be made without additional evidence establishing that defendant purposefully treated minorities protected under Title VII less favorably than other persons."  *Id.*  "If statistical evidence is insufficient to establish discriminatory intent, [employees] may bolster their case by introducing historical, individual, or circumstantial evidence."  *Anderson v. Douglas & Lomason Co., Inc.*, 26 F.3d 1277, 1285 (5th Cir. 1994).

In this case, USBP admits that Mr. Joyner is a member of a protected class (race) and that

a member outside his class was selected for the Division Chief promotion. Instead, USBP argues that Mr. Joyner did not "apply" for the Division Chief position (Doc. 109-1 at 16) and so "Joyner cannot show that he was rejected for the position." *Id.* This is a bizarre argument unsupported by the record evidence. There is no dispute Mr. Joyner applied for the Division Chief job via USAJobs announcement no. USBP-IMP-10168092-JRB. There is no dispute Mr. Joyner was initially scored by ACPA Banco and DCPA Pedregon and offered an interview for the position. There is no dispute Mr. Bovino cancelled the announcement which Mr. Joyner and Mr. Williams had applied under. There is no dispute Mr. Bovino obtained approval from USBP headquarters to cancel the position by misrepresenting his reasons for wanting to do so. Most importantly, Mr. Bovino admits that he could have selected Mr. Joyner (or Mr. Williams) for Division Chief instead of Mr. Bullock, but Mr. Bovino simply chose not to.

USBP's argument that Mr. Joyner "did not apply" for the Division Chief position and therefore could not have been "rejected" for the position is Kafkaesque. Mr. Bovino explicitly admitted during his deposition that he rejected Mr. Joyner for the job in favor of Mr. Bullock. More fundamentally, USBP's argument that Mr. Joyner "did not apply" for the Division Chief position because Mr. Bovino purposefully cancelled the list specifically to deprive Mr. Joyner the opportunity to compete for the job is just an artful way of arguing that federal agencies should be legally permitted to discriminate against employees so long as they do ***cleverly*** and in ***secret***. Title VII was not designed to be circumvented by such shenanigans.

Whatever hyper-technical or bureaucratic reading USBP attempts to give the phrase "qualified" in the Title VII context, Mr. Joyner has met it in this case. USBP cannot now shield itself from Title VII liability because its officer, Gregory Bovino, secretly recruited a white comparator for promotion and then purposefully cancelled Mr. Joyner's timely-submitted

application while purposefully misleading Mr. Joyner and USBP leadership to prevent Mr. Joyner from competing against Mr. Bullock.  USBP cites no case law in support of this stretched argument and devotes no more than about one page of briefing to it.  *See* Doc. 109-1 at 16.

**C.   Mr. Bovino's Proffered Reason for Selecting Mr. Bullock Is Legally Insufficient**

Once the plaintiff establishes his prima facie case, the burden of production shifts to the defendant to put forward a non-discriminatory justification for its adverse employment decision. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (emphasis in original) (internal citations omitted).  The defendant "must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *Id.* (emphasis in original).

An employer's subjective reason for not selecting a candidate, such as a subjective assessment of the candidate's qualifications, may serve as a legitimate, nondiscriminatory reason for the candidate's non-selection. *Alvarado v. Texas Rangers*, 492 F.3d 605, 616-17 (5th Cir. 2007). "Such a reason will satisfy the employer's burden of production, however, only if the employer articulates a clear and reasonably specific basis for its subjective assessment." *Id*. The test is whether the employer "frame[s] the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255-56 (1981).

More specifically, in the Fifth Circuit, a federal agency's proffered reason that the plaintiff was not selected for a job because he was not "sufficiently suited" is an insufficient reason "as a matter of law" because, in the absence of objective corroboration or plausible reasoning, "[t]he employer just might have found the candidate 'not sufficiently suited' *because of* a protected trait such as age, race, or engaging in a protected activity." *Patrick v. Ridge*, 394 F.3d 311, 317 (5th

Cir. 2004) (emphasis in original).

In *Alvarado*, *supra*, the plaintiff, a woman, sued the Texas Department of Public Safety ("DPS") for promoting several men to the coveted Texas Rangers Division instead of her. 492 F.3d at 609. DPS defended by pointing out it interviewed Ms. Alvarado along with all other applicants, and DPS assessed that Ms. Alvarado was less qualified than the men DPS selected. *Id.* at 616-18. It was true that DPS interviewed all the applicants and gave them scores based on their interview answers. It was true that Ms. Alvarado scored 29th among all applicants. Nevertheless, plaintiff argued that because DPS failed to credibly explain *why* it awarded Ms. Alvarado those scores, and because DPS failed to objectively explain *why* she was less qualified than her male comparators, DPS failed to proffer a credible reason for her non-selection (pretermitting a pretext analysis under the *McDonnell Douglas* standard). *Id.* The Fifth Circuit agreed:

> Without some indication of the factual basis or specific reasons for Alvarado's interview score, the score says nothing about whether her non-selection for the Rangers was the product of intentional sex discrimination. Instead, the score **"is at least as consistent with discriminatory intent as it is with nondiscriminatory intent" because Alvarado may well have received the relatively low interview score on account of her sex** . . . . To the extent DPS asserts on appeal that Alvarado did not receive an appointment to the Rangers because she was not the among the best qualified candidates, this assertion is also insufficient to satisfy DPS's burden of production . . . . **Without evidence of the candidates' relative qualifications, the mere assertion that DPS hired the best qualified candidates is insufficient to satisfy its burden of production, as it does not afford Alvarado "a full and fair opportunity to demonstrate pretext."**

*Id.* at 617-18 (emphasis added).

Finally, the Fifth Circuit holds that a federal-agency employer may not proffer it selected the "best qualified candidate" for a job unless it can show that – at the time it failed to select the plaintiff – the employer "already knew that the ultimately selected individual's qualifications were superior." *Patrick*, *supra*, 394 F.3d at 318. In *Patrick,* the Fifth Circuit reversed summary judgment in favor of the plaintiff-employee who was passed over by her federal employer in favor

of another employee because, at the time the employer decided to reject the plaintiff's application for promotion, the eventual selectee had not even applied for the job.  *Id.*  The Fifth Circuit held that "when an employer offers evidence of an otherwise legitimate, nondiscriminatory reason which unmistakably demonstrates that it *could not have motivated* the employer to deny the promotion to a qualified candidate, such an indisputable impossibility cannot satisfy the employer's burden of production."  *Id.* at 318.

The holdings of both *Alvarado* and *Patrick* are persuasive in this case.  Here, it is undisputed Mr. Joyner was qualified for the Division Chief position.  It is undisputed Mr. Bovino preferred Mr. Bullock and attempts to justify that preference by stating his opinion Mr. Bullock was better qualified than Mr. Joyner (or Mr. Williams).  But the Acting Chief Patrol Agent of New Orleans Sector at the time, Joe Banco, testified in the *Williams* case that he urged Mr. Bovino to at least compare the credentials of Mr. Bullock to Mr. Joyner, Mr. Williams, and the other candidates, and Mr. Bovino refused.  Mr. Bovino himself testified that he did not compare the credentials of the men prior to cancelling the Division Chief announcement and recruiting Mr. Bullock.

On these facts, USBP fails to offer any credible or legitimate reason for passing over Mr. Joyner and Mr. Williams in favor of Mr. Bullock.  Mr. Bovino claims that Mr. Bullock was the "best qualified" for the job, but, without comparing the candidates, Mr. Bovino's subjective beliefs are "at least as consistent with discriminatory intent as [they are] with nondiscriminatory intent" because Mr. Bovino may have simply found Mr. Bullock preferable because of his race.  *Alvarado*, *supra*, at 617-618.

In its motion for summary judgment, USBP offers many declarations from witnesses who – **after** Mr. Bullock was selected and **after** Mr. Joyner sued for race-based discrimination – now

claim that Mr. Bullock was more qualified than Mr. Joyner.  First, the objective scoring and resumes in the case strongly suggest Mr. Joyner was clearly more qualified than Mr. Bullock.  But, second, the *post hoc* assessments of USBP management cannot transform Mr. Bovino's admitted failure to compare the credentials of Mr. Joyner and Mr. Bullock before cancelling Mr. Joyner's application to a sufficient justification under the *McDonnell Douglas* standard.  *Patrick*, 394 F.3d at 318.  Assuming the Court agrees, USBP has failed to proffer a legitimate reason for Mr. Joyner's non-selection, and USBP's motion for summary judgment must be denied.

**D.**     **There Is Sufficient Evidence of Pretext for a Jury Trial**

For the sake of argument, assuming Mr. Bovino's proffered reason for selecting Mr. Bullock is minimally sufficient to carry USBP's burden in the *McDonnell Douglas* framework (which it is not), the plaintiff "must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981).  A plaintiff proves discriminatory intent either directly by showing that a discriminatory reason more likely motivated the employer's decision, or by indirectly showing the employer's explanation is not worthy of credence.  *Id.*  In non-selection cases, a fact-finder may also infer discriminatory intent when the plaintiff was "clearly better qualified" than the promoted comparator.  *EEOC v. La. Office of Cmty. Servs.*, 47 F.3d 1438, 1444 (5th Cir. 1995).

On this record, there is ample evidence Mr. Bovino's stated reasons for selecting Mr. Bullock were untrue; that the real reason was rooted in racial animus; and that Mr. Joyner was clearly better qualified for the Division Chief position than Mr. Bullock.

First, on May 9, after Mr. Bovino had already recruited Mr. Bullock, he contacted Chief Hudson asking permission to cancel the Division Chief job announcement.  In those May 9th

emails, Mr. Bovino almost certainly misrepresented his reasons for wanting to cancel the competitive list:

> Rich,
>
> Gave it some thought, and **I think it would be best to cancel the list and wait 90 days.** Rivet is acting Division Chief already and he can continue in that role. **I don't think the announcement received the attention it should've, and we will make more of an effort to recruit the right pool of candidates.** How do I go about canceling the list at this point? (emphasis added)

Mr. Bovino never re-announced the job. The record evidence suggests he never intended to. Just two weeks later, starting on May 23, Bovino and Bullock began secretly collaborating by email regarding the specific language Bullock should use in his official memorandum to Mr. Bovino and USBP headquarters requesting promotion to the Division Chief position. Mr. Bovino never revealed these plans to anyone until after Mr. Joyner and Mr. Williams filed their Charge of Discrimination (and, even then, it appears Mr. Bovino did not reveal the truth to the EEO investigator assigned to the file).

Likewise, Mr. Bovino's proffered reason that Mr. Bullock was the best qualified candidate, or that Mr. Bovino was concerned that New Orleans Sector staff were not respecting his status as the incoming CPA, or that Mr. Bovino simply wanted to have one of his "own people" on staff are not worthy of credence *because Mr. Bovino never suggested any of these theories at the time he selected Mr. Bullock, but only after his motives were questioned in this litigation*. Mr. Bovino's proffered reasons are not worthy of credence because those reasons are inherently *unbiased* – in other words, there is no plausible reason that Mr. Bovino would not have simply shared these thoughts with Chief Hudson, Acting CPA Banco, or Mr. Joyner himself if they had been true. To date, Mr. Bovino himself has never offered an explanation for why he did not justify his actions at the time by simply telling the parties his post-litigation, *post hoc* "concerns." The record evidence

suggests this is because Mr. Bovino came up with these reasons only after Mr. Joyner (and Mr. Williams) filed their Charges of Discrimination in this case.

Second, Mr. Bovino admits he selected Mr. Bullock for the Division Chief position even after, on May 23, 2018, Mr. Bullock sent Mr. Bovino obviously racially charged emails that depicted Mr. Bovino as a confederate war general, the rank-and-file agents assigned to New Orleans Sector as confederate soldiers, and the current New Orleans Sector leadership (including Teresa Pedregon, a Hispanic woman; Mr. Joyner, a black man; and Mr. Williams, a black man) as beleaguered Union soldiers.  Mr. Bovino clearly recognized the email was inappropriate for work, and told Mr. Bullock to delete it, but did not take any further action.  At least two objective, independent CPB employees in this case have since seen these emails.  CBP's legal counsel referred Mr. Bullock for investigation for passing racially charged emails at work, and fellow CPA and former Directorate Chief Brian Hastings testified he felt compelled to do likewise. Furthermore, multiple witnesses in this case, including Mr. Bovino, admit that Black and African American agents are statistically underrepresented within USBP, although the witnesses can offer no plausible explanation for why.  These facts, taken in the light most favorable to Mr. Joyner, suggest that racial animus (or racial preference) was the real reason Mr. Bovino selected Mr. Bullock over Mr. Joyner.

Finally, taken in the light most favorable to Mr. Joyner, the facts, objective scoring, and relative work history of Mr. Joyner compared to Mr. Bullock confirm that Mr. Joyner was clearly better qualified for the Division Chief job.  Mr. Joyner scored 41 points compared to Mr. Bullock's 22 points on the Kepner-Tregoe exam used during this litigation.  Mr. Joyner had held objectively higher ranked positions than Mr. Bullock.  Mr. Joyner had served in a high-ranking capacity as an Acting Assistant Patrol Agent in Charge of Tucson Station in Tucson Sector, directly supervising

hundreds of USBP agents and supervisory personnel.  Mr. Joyner had also, previously, directly supervised Mr. Bullock while serving at Tucson Station.

## E.    Conclusion

In the end, USBP brings nothing new to the evidentiary table since the last time this Court denied USBP's essentially identical motion for summary judgment in the *Williams* case.  Mr. Joyner easily establishes his prima facie case, while Mr. Bovino fails to offer a legally sufficient reason for selecting Mr. Bullock over Mr. Joyner to carry USBP's intermediate burden in the *McDonnell Douglas* analysis.  Even if he had, the only plausible reason for Mr. Bovino's selection – on this record, construing the evidence in the light most favorable to Mr. Joyner – is that Mr. Bovino preferred Mr. Bullock to Mr. Joyner (and Mr. Williams) because of their race. Accordingly, defendant's motion for summary judgment should be denied.

Respectfully submitted:

/s/ Kevin S. Vogeltanz
Kevin S. Vogeltanz, TA (Bar #32746)
Alec W. Szczechowski (Bar #38422)
The Law Office of Kevin S. Vogeltanz, LLC
823 Carroll Street, Suite A
Mandeville, LA 70448
Telephone:  (504) 275-5149
Facsimile: (504) 910-1704
Email: vogeltanz@gmail.com

*Attorneys for plaintiff Jon Joyner*

## LOCAL RULE 5.4 CERTIFICATION

Pursuant to Local Rule 5.4, no certificate of service is required for this motion because all parties are electronic filers and will receive notice through the court's electronic filing system.

/s/ Kevin S. Vogeltanz