Christopher Bullock
November 23, 2020

EXHIBIT

L

1

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4   RANDOLPH WILLIAMS III

5          Plaintiff,

6     v.                          CIVIL NO. 2:19-CV-12841

7   KEVIN K. MCALEENAN,
    ACTING SECRETARY, UNITED
8   STATES DEPARTMENT OF
    HOMELAND SECURITY
9
           Defendant.
10

11

12   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

13     TRANSCRIPT OF THE VIDEOCONFERENCE DEPOSITION OF:

14              CHRISTOPHER BULLOCK,

15   LOCATED AT 423 CANAL STREET, SUITE 409,

16   NEW ORLEANS, LOUISIANA 70130, TAKEN ON BEHALF OF

17   PLAINTIFF, REPORTED IN THE ABOVE ENTITLED AND

18   NUMBERED CAUSE BY YOLANDA J. PENA, CERTIFIED COURT

19   REPORTER FOR THE STATE OF LOUISIANA.

20   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

21          REPORTED AT:

22          18487 BELLE GROVE ROAD

23          PRAIRIEVILLE, LOUISIANA  70769

24

25     COMMENCING AT 9:08 A.M., ON NOVEMBER 23, 2020.

Christopher Bullock
November 23, 2020

50

1      A.  Yes.

2      Q.  Okay.  How did you first learn about the

3  open position at division chief of New Orleans

4  Sector?

5      A.  I had a phone conversation with Chief

6  Bovino, and he told me that there was an open

7  position.

8      Q.  Do you have any idea approximately when

9  that conversation happened?

10     A.  I can't recall the exact date.

11     Q.  Can you recall the month?

12     A.  Exactly when that first conversation

13  happened, no, I'm not sure.

14     Q.  Okay.  Do you remember, when you had this

15  conversation with Mr. Bovino, had he learned yet --

16  I mean, to your knowledge, had he learned yet that

17  he was going to be selected, or had been selected,

18  to be the new permanent chief patrol agent of

19  New Orleans Sector?

20     A.  Yes.

21     Q.  Okay.  And so am I correct, then, in

22  assuming that the nature of the conversation was

23  that Mr. Bovino knew that he was going to be the new

24  chief patrol agent and he was inviting you to join

25  him, for lack of a better word, as the division

Christopher Bullock
November 23, 2020

51

```
 1   chief in New Orleans Sector?  Is that a fair
 2   characterization?
 3        A.  Yes.
 4        Q.  Okay.  Prior to that conversation, had you
 5   ever had any conversation with anyone about the idea
 6   of promoting or moving to New Orleans Sector?
 7        A.  No.
 8        Q.  Prior to that conversation, had you ever,
 9   just in your mind as you thought about your career
10   arc in border patrol, considered moving to,
11   transferring to, or promoting to any position in
12   New Orleans Sector?
13        A.  No.
14        Q.  My understanding is that although
15   New Orleans Sector, in terms of linear miles, may
16   not be the smallest sector in the border patrol, in
17   terms of both number of agents and budget, it is the
18   smallest sector; is that correct?
19        A.  As far as I know, yes.
20        Q.  Okay.  If Mr. Bovino had never become the
21   chief patrol agent in New Orleans Sector and had
22   never telephoned you and had invited you to join him
23   there at sector, can you imagine any scenario where
24   you would have been interested in moving to the
25   New Orleans sector?
```

Christopher Bullock
November 23, 2020

52

```
 1        A.   Yes.
 2        Q.   Okay.  In what kind of circumstance?
 3        A.   If there was an opening for which I was
 4   qualified and I was encouraged by anyone that I
 5   respected to apply and it was acceptable with my
 6   family, then I would have considered applying.
 7        Q.   Okay.  And last question on that thread,
 8   just so I'm positive, though.  Before the
 9   conversation with Mr. Bovino, that had never
10   happened?  Meaning you had never investigated a
11   potential move to New Orleans; no one had encouraged
12   you to move to New Orleans that you respected.  Is
13   that accurate?
14        A.   Yes.
15        Q.   Okay.  I'm going to show you -- actually,
16   hang on.  Let me ask a couple more questions before
17   I show it to you.  So I'm going to show you soon
18   some emails between you and Mr. Bovino about this
19   move.
20             But can you explain to me why you did not
21   apply competitively, through USAJobs or any other
22   competitive process, for the division chief position
23   but you instead submitted a request by memorandum?
24        A.   As I recall, when I became aware of the
25   vacancy, I'm not sure if a USAJobs announcement was
```

Christopher Bullock
November 23, 2020

53

1    open.  So I applied via memorandum, resume.

2         Q.  Okay.  At the time that you applied via

3    memorandum, if you have any recollection whatsoever,

4    was it your recollection that there had been a

5    competitive posting that had been canceled?  Or is

6    it your recollection that there had never been a

7    competitive posting whatsoever?

8         A.  No.  It's my recollection that there was a

9    competitive announcement that was pending.  I just

10   don't recall that it was -- if it was still open

11   when I became aware or if it had already closed.

12        Q.  Okay.  When you had this phone call with

13   Mr. Bovino, was the topic of whether you should

14   apply by memorandum or through a competitive process

15   discussed?

16        A.  When I first talked to Mr. Bovino, I don't

17   recall if that was discussed.

18        Q.  Okay.  At any time before you became the

19   division chief in October 14, 2018, did you ever

20   have a conversation -- by phone, email, face to

21   face, whatnot -- with Mr. Bovino in which it was

22   discussed that you ought to apply by memorandum

23   versus a competitive application?

24        A.  So when he first -- when Chief Bovino first

25   spoke to me about there being a vacancy, he told me

Christopher Bullock
November 23, 2020

54

1   that if I wanted to be considered that I should

2   submit a memorandum.

3       Q.  Okay.  Do you have any understanding of why

4   Mr. Bovino told you this?  Meaning, do you have any

5   understanding of why Mr. Bovino suggested that if

6   you wanted to be considered, you ought to apply by

7   memorandum as opposed to a competitive application?

8       A.  My understanding is that the competitive --

9   the recent vacancy announcement from the USAJobs

10  was -- had already opened, and I'm not sure of this,

11  but may have already closed by the time he told me

12  that.

13      Q.  Okay.  Now, in your entire career up until

14  today, have you ever been either the recommending

15  official or the selecting official for a promotion

16  at border patrol?

17      A.  Yes.

18      Q.  Okay.  And is the most recent time you've

19  done that in your capacity as either the division

20  chief of New Orleans Sector or the acting deputy

21  chief patrol agent?

22      A.  Yes.

23      Q.  Okay.  Am I correct -- I have a

24  memorandum -- it's somewhere in discovery -- that

25  was provided by the Government, But I just -- I

Christopher Bullock
November 23, 2020

92

```
1    thinking when you're writing this email?  Like, what
2    issue are you trying to avoid?
3         A.  I was trying to avoid Chief Bovino getting
4    in trouble.  Because during the time that I was
5    considering applying -- applying for the job, I went
6    online and looked at their org chart on the sector
7    web page, and I saw that it appeared that one
8    Pedregon reported to the other.
9         Q.  Meaning that that's how it looked to you in
10   real life?  Like, it looked to you as if there was
11   maybe a reporting issue because the spouse of Teresa
12   Pedregon was actually reporting to her at the time
13   that you looked; is that accurate?
14        A.  Yes, that's accurate.  That's how it
15   appeared to me, and I wanted him to be aware so it
16   didn't cause him trouble.
17        Q.  And then he responds in the next email,
18   "We'll fix it."  Acknowledging the issue, correct?
19        A.  Yes.
20        Q.  Okay.  And that was on May 25, 2018.  All
21   right.
22             And then in -- the next email is at the
23   bottom of 13, and it continues on into page 12.  So
24   let me preface this by saying obviously, as a
25   United States government employee, it's wrong and
```

Christopher Bullock
November 23, 2020

```
1    it's inappropriate if you were to ever express any
2    racist or racially charged viewpoints at work.  I
3    mean, would you agree with that, Mr. Bullock?
4         A.  Yes.
5         Q.  Yeah.  Certainly, I think that everyone can
6    agree, but, you know, you're in the witness chair,
7    so I have to ask you.
8              I mean, you agree with me that racism is
9    morally and ethically wrong, correct?
10        A.  Yes.
11        Q.  You agree with me that racism is
12   un-American, correct?
13        A.  I agree that it's not appropriate in
14   America, yes.
15        Q.  Yeah.  Meaning it's un-American if you're a
16   racist, if you hold racist views, that's an
17   un-American perspective that that person would have.
18   You would agree with me about that?
19        A.  I would agree that it's not appropriate in
20   America.  I'm not sure, you know, how to
21   categorize -- how that way of saying it categorizes
22   it.  So there has been racism in America, I'm aware,
23   but it's -- I agree with you that it's not
24   appropriate in America.
25        Q.  Okay.  And to the extent that -- to the
```

Christopher Bullock
November 23, 2020

97

```
 1    serious misconduct?  Is that an accurate statement?
 2        A.  Yes.
 3        Q.  Okay.  So the progressive disciplinary
 4    policy, to the extent that one exists, it is not
 5    binding within the discretion of the disciplining
 6    official.  Some misconduct might be so serious that
 7    it warrants immediate termination, correct?
 8        A.  Yes.
 9        Q.  All right.  Is it your testimony that there
10    could potentially be some racist attitudes or
11    conduct in the workplace that are simply not serious
12    enough; that in every single instance, they would
13    warrant immediate termination?  Is that your
14    testimony?
15        A.  It's possible, yes.
16        Q.  All right.  Give me an example of something
17    that would be racist in the workplace but not so
18    racist that would immediately warrant termination.
19        A.  To me, an example would be if somebody
20    posted, for example, a Black Lives Matter poster in
21    the workplace.  That could be construed as being
22    racist, and I'm not sure that that would warrant
23    immediate termination.
24        Q.  All right.  And I'm not going to -- I
25    promise I'm not going to pester you about this too
```

Christopher Bullock
November 23, 2020

98

```
 1    much.  You gave me one example.  Can you give me any
 2    other examples of something that might be racist but
 3    not so racist that it warranted immediate
 4    termination?
 5         A.  I can't, you know, think of examples right
 6    off the top of my head but...
 7         Q.  That's okay.  All right.  What is -- let's
 8    say that you found that an agent had, I don't know,
 9    in a cubicle or an office or in a lunch space or,
10    you know, wherever, had posted some poster about
11    Black Lives Matter, the political movement.  What,
12    if anything, would you potentially find racist about
13    that?
14         A.  Someone might perceive that to be that
15    somebody only supported black lives and not any
16    others.
17         Q.  Okay.  And let's just kind of carry this
18    example through to conclusion.  If, in fact, in
19    New Orleans Sector you saw that some agent had
20    posted some, you know, poster or, in whatever medium
21    or format, a Black Lives Matter thought or speech or
22    whatnot, do you think that you would actually refer
23    that person for investigation?
24         A.  Probably not.
25         Q.  Okay.  Has that ever happened?  Has anybody
```

Christopher Bullock
November 23, 2020

110

```
 1        Q.  Did you think at all at that moment, Well,
 2   I mean, I'm going to be sending this email, and to
 3   the extent that I'm going to be referencing Civil
 4   War-era imagery, I should depict Mr. Bovino as a
 5   Union officer because, of course, one, the Union
 6   actually won the war; two, the Union fought for the
 7   United States of America and you are assigned and
 8   employed by the United States of America -- you live
 9   in the United States of America today -- and three,
10   it might give the wrong impression if I were to
11   circulate an email in which I analogized the chief
12   patrol agent, New Orleans Sector, to a Confederate
13   war officer?
14        Did you have any of those thoughts when you
15   were creating the email?
16        A.  No, I actually didn't think about that.
17        Q.  Okay.  My second question.  To the extent
18   that you decided to analogize the New Orleans sector
19   to a bygone era of the United States, why the Civil
20   War and, say, not the, I don't know, the 1920s or
21   the 1950s or the Vietnam era or any other historical
22   time period of the United States?
23        A.  I just wanted to portray any
24   (indiscernible) faction that I could, and I know
25   that -- also that Chief Bovino is an American
```

Christopher Bullock
November 23, 2020

111

```
1   history buff, and, you know, I thought that he would
2   think that those pictures would be funny.
3        Q.  To the extent that you believed that
4   Mr. Bovino was a -- well, strike that.
5            Did you have this idea about Mr. Bovino
6   because you were friends with Mr. Bovino; you knew
7   in reality he was an American history buff?
8        A.  Yes.
9        Q.  Okay.  Do you joke about, kind of, American
10  history stuff with Mr. Bovino often?
11       A.  No.
12       Q.  Oh.  Well, why did you think he would find
13  this funny, then?
14       A.  Because I've known him to bring up American
15  history and other world history analogies in
16  unrelated conversations.
17       Q.  Okay.  Fair enough.  So it would seem to me
18  that, you know, even -- if you need to get your
19  light, you can get that light.  As a taxpayer,
20  Mr. Bullock, I appreciate that you-guys are trying
21  to save energy on my tax bills.  Thank you very
22  much.
23           It would seem to me that if I was going to
24  compose -- or you were going to compose this sort of
25  email and you wanted to reference a time period and
```

Christopher Bullock
November 23, 2020

112

```
1    you wanted to reference the earliest possible time
2    period, even if you wanted to reference a war, why
3    didn't you opt for the American Revolution and, say,
4    George Washington or any of the famous American
5    revolutionaries?
6         A.  You know, I'm not sure why.
7         Q.  I mean, certainly, there's nothing -- no
8    one would ever accuse George Washington -- no one
9    identifies the American Revolution with the same
10   kind of potentially racially charged imagery they
11   might associate with the Civil War.  I mean, you
12   agree with that, right?
13        A.  Yeah, I would agree with that.
14        Q.  And so, again, at any time when you were
15   composing this email, did you ever stop and think,
16   Gee, I'm really maybe going to send an email that
17   people might find inappropriate.  It would be better
18   if I picked different imagery?
19        A.  No, honestly, I did not think about that.
20        Q.  Okay.  In retrospect, though, you would
21   agree that it was a foolish email to send?  You
22   would agree with that?
23        A.  Yes.
24        Q.  Okay.  And specifically because of the
25   potential that someone could look at the email and
```

Christopher Bullock
November 23, 2020

113

```
 1    find it to be racially charged, specifically because
 2    you chose Confederate imagery.  You would agree with
 3    that?
 4         A.  Yes.
 5         Q.  Okay.  All right.  Well, let's move down.
 6    So now you have selected another image, and this
 7    image is analogizing the New Orleans all-hands
 8    meeting.  And if I understand correctly, the
 9    all-hands meeting, as the name suggests, is a phone
10    call or a teleconference in which everyone that is
11    assigned to the sector at any level participates; is
12    that accurate?
13         A.  It has happened that way.  But normally,
14    traditionally, all-hands meetings are when all hands
15    show up to the meeting.  It's been that way, the way
16    you described, because of COVID.
17         Q.  Okay.  Is it the case that there's about 70
18    or so officers assigned to New Orleans Sector, or is
19    it a lot more than that?
20         A.  It's approximately -- it's just over
21    70 agents, yes.
22         Q.  So there have been times when all the
23    agents would actually show up physically to sector
24    headquarters; is that right?
25         A.  Yes.  We had an all-hands meeting here to
```

Christopher Bullock
November 23, 2020

119

1    1:24:36 p.m., correct?

2        A.  Yes.

3        Q.  And Mr. Bovino's response was short.  It

4    was, "Oh, geez."  And then all capital letters,

5    "delete," with four exclamation points, correct?

6        A.  Yes.

7        Q.  Okay.  When you read that, what did you

8    think?

9        A.  I think that he saw those images and

10   thought that they were inappropriate, as I should

11   have, and thought that they should be deleted.

12       Q.  Now, I have worked for myself for a long

13   time, and so -- but there was a time in my life as a

14   lawyer that I was with a firm and I had bosses and

15   stuff.  And if I had sent that email and got that

16   response, I know exactly how I would have felt.  I

17   would have felt that my stomach just dropped out of

18   my body and I would have been panicked.

19            So I want you to describe for me.  What did

20   you feel like when you got that email a minute and

21   30 seconds later?

22       A.  I don't remember what I felt like, but I

23   remember looking back at my email and understanding

24   why he wrote that.

25       Q.  Okay.  Did you ever have a phone call with

Christopher Bullock
November 23, 2020

120

```
 1    Mr. Bovino or face-to-face or any other
 2    communications of any character whatsoever about
 3    that email?
 4         A.  I don't remember.
 5         Q.  Well, just take a moment and think because
 6    that's an important question for me.  So just take a
 7    moment and think.
 8         A.  Yeah, I don't remember if there was ever a
 9    phone call or another conversation specifically
10    about that email.
11         Q.  Did you delete the emails after he told you
12    to delete them?
13         A.  I don't even remember that.  I don't
14    remember.
15         Q.  Were you worried that you had just done
16    something that you might be investigated for by OPR
17    or anyone else?
18         A.  I worried that it would be possible, yes.
19         Q.  Did you think at that moment that -- based
20    on kind of Mr. Bovino's very swift response to that
21    email, did you ever think to yourself, I should
22    never -- I should never again send official
23    government emails that has any sort of potential to
24    be misconstrued as -- you know, as a joke or a bad
25    joke or something like that?  Did you think that?
```

Christopher Bullock
November 23, 2020

121

```
 1        A.  I don't remember what I thought back when
 2   that happened.
 3        Q.  Well -- I'm sorry.  Go ahead, finish your
 4   answer.
 5        A.  No, go ahead, sir.  I don't remember what
 6   the thought was after that.
 7        Q.  Looking back with the benefit of hindsight,
 8   I mean, as you look back, is that one of the changes
 9   that you made in kind of your work behavior, that
10   once you received that -- I'm going to use the work
11   "rebuke" because that's what I think it was, but
12   however you want to describe it.  Once you received
13   that response or rebuke, looking back now, you can
14   say, "Okay, I changed my behavior after receiving
15   that.  I learned my lesson.  I tried to make a joke.
16   It was -- it might have been construed by some as
17   being racially charged because of the imagery that I
18   used.  And looking back, I stopped doing that sort
19   of thing."  Is that accurate or not accurate?
20        A.  It's probably accurate, that I thought to
21   myself that I should not send those types of emails,
22   yes.
23        Q.  Okay.  So I want you to now scroll down to
24   page 23 of the PDF.  And at the top of the page is
25   an email from Christopher Bullock -- you,
```

Christopher Bullock
November 23, 2020

134

```
 1   political.
 2       Q.  All right.  So kind of moving past that,
 3   then, I understand you didn't create the image.  You
 4   thought it was funny, so you saved it.  Why did you
 5   decide to send it to your wife on July 31, 2018?
 6       A.  It's just a -- kind of a way for me to tell
 7   her that Chief Bovino and I would be working
 8   together, you know, side by side.
 9       Q.  Okay.  Of course, in 2018, President Obama
10   was not the president anymore.  It was Donald Trump,
11   correct?
12       A.  Correct.
13       Q.  Right.  You didn't think to -- well, did
14   you think to send her something that, you know, was
15   more time appropriate, meaning that, you know, it
16   was you and President Trump as opposed to President
17   Obama?
18       A.  No.  I didn't have a picture like that.
19   This is a picture that I had saved that was created
20   by somebody else, and that's what I had.
21       Q.  Okay.  Did you and your wife ever have, you
22   know -- well, I take that back.
23           She responds to this email, but she
24   responds to it like four days later, and in her
25   response doesn't seem to be referencing the image.
```

Christopher Bullock
November 23, 2020

135

```
 1    You would agree with that?
 2        A.  Yes.
 3        Q.  Did she, like -- when you came home from
 4    work that day or at sector that day, did she say,
 5    like, "Hey, Chris, that's a funny email," or "That's
 6    a weird email"?  I mean, did she say anything to you
 7    about it?
 8        A.  I don't remember.
 9        Q.  Okay.  And then you -- then you forwarded
10    it, if you scroll back up to the top of page 23.
11    Then you forwarded the entire chain, including that
12    image, to Mr. Bovino, correct?
13        A.  Yes.
14        Q.  Okay.  And did Mr. Bovino ever respond to
15    you and say anything about the -- those?
16        A.  I don't remember if he did.
17        Q.  Okay.  I guess my kind of last question on
18    the thread is that we talked before about -- I think
19    on May 25th, when you were kind of rebuked or
20    Mr. Bovino told you to delete those Civil War
21    Confederate images or emails, and you thought to
22    yourself, Well, I probably shouldn't do anything
23    like that ever again.
24             Did you not have that same idea
25    approximately, you know, two months later when you
```

Christopher Bullock
November 23, 2020

136

1    forwarded your wife and then Mr. Bovino an image
2    that depicted you and Mr. Bovino replacing the
3    president and the vice president standing behind
4    President Obama?
5        A.  No.
6        Q.  Why not?
7        A.  Because I didn't see that other than an
8    image of the two of us together in makeshift
9    positions.
10       Q.  So you don't find anything racially charged
11   about this email?
12       A.  No.
13       Q.  Okay.  You don't -- you don't view it as
14   depicting maybe a threat or violence against the
15   president of the United States who's black?
16       A.  No.
17       Q.  Do you at least understand how some people
18   could view it as, you know, a threat against
19   President Obama?
20       A.  No, not at all.
21       Q.  Okay.  Have you ever been investigated for
22   this image?
23       A.  To my knowledge, no.
24       Q.  Okay.  Fair enough.
25           Let's move on.  Actually, just give me one

Christopher Bullock
November 23, 2020

137

```
 1    second.  I just want to read one thing before I
 2    leave this topic.
 3                 MS. GUTIERREZ:  Can we take a quick --
 4          a little break?
 5                 MR. VOGELTANZ:  Let's take a quick
 6          break right now.
 7                      (Recess taken.)
 8                 MR. VOGELTANZ:  Back on the record.
 9    BY MR. VOGELTANZ:
10        Q.  Mr. Bullock, just a couple of little
11    questions before we move on.  Per that email chain,
12    which is what has been entered in as Plaintiff's
13    Exhibit No. 1, what you know as Bullock No. 5.  It's
14    the 32-page email that has the Confederate images
15    and whatnot in it.
16                 You -- according to that email chain, you
17    first forwarded your lateral request -- originally
18    addressed it to Mr. Banco.  Originally forwarded
19    that to Mr. Bovino for his input on May 23rd.
20                 Did you ever forward to him that lateral
21    request before the 23rd, or that was first time that
22    you did that?
23        A.  I don't remember.
24        Q.  Okay.  Did Mr. Bovino ever tell you that he
25    was successful in having the competitive posting for
```

Christopher Bullock
November 23, 2020

148

```
 1          Okay.  I hear you scrolling.  Do you need
 2   more time to review the document?
 3          A.  It's just when you say was it accurate,
 4   there may have been things that I should have
 5   updated.  But it's accurate that I sent that resume,
 6   and it does list my experience.
 7          Q.  It's accurate to the best of your kind of
 8   recollection.  Is that fair?
 9          A.  Yes.
10          Q.  Okay.  Was there -- why did you actually
11   submit the request on July 9, 2018, as opposed to
12   any other day?
13          A.  Because Chief Bovino asked me to wait until
14   he arrived here before I submitted the request.
15          Q.  And what was your understanding of why he
16   asked you to do that?
17          A.  My understanding is that for the same
18   reasons that he canceled the list, he wanted to make
19   sure he was involved in the process.
20          Q.  Okay.  Was it your understanding that -- as
21   of July 9, 2018, when you submitted your request,
22   was it your understanding that you were guaranteed
23   to be given the position?
24          A.  No.
25          Q.  What were all the things that could have
```

Christopher Bullock
November 23, 2020

154

```
 1      Q.  Okay.  Have you yourself as a recommending
 2  or selecting official ever used a Kepner-Tregoe
 3  exercise before?
 4      A.  Yes.
 5      Q.  Do you know where you actually scored
 6  alongside anyone else when you applied for the
 7  division chief of New Orleans position using any
 8  sort of scoring matrix or a Kepner-Tregoe matrix?
 9      A.  I don't know how I was scored when I
10  applied for this.
11      Q.  Okay.  What I would like to do -- and I
12  really don't think it's going to take more than just
13  a couple minutes.  I would like to ask you questions
14  about this form, about your own experiences at the
15  time that you applied for the division chief
16  position at issue in this case, which I think, based
17  on these emails that we looked at, was July of 2018.
18  Does that make sense?
19      A.  Yes.
20      Q.  All right.  So the first one, supervisory
21  field experience, at the time of your application,
22  had you ever been an SBPA, and SOS, an FOS, or a
23  watch commander?
24      A.  Yes.
25      Q.  And I'm sorry.  On a permanent basis, I
```

Christopher Bullock
November 23, 2020

```
 1    should say.
 2         A.  Yes.
 3         Q.  What was the -- of the one, two, and three,
 4    three being the highest, what was the highest of
 5    those positions you had permanently held at the time
 6    of your application?
 7         A.  Two.
 8         Q.  All right.  Command experience, on the
 9    second box, what is the highest of the four that you
10    had held at the time -- on a permanent basis at the
11    time of your application?
12         A.  One.
13         Q.  All right.  Permanent assignment diversity.
14    At the time of your application, how many -- what's
15    the highest, in terms of multiple station sectors or
16    borders, you had served on?
17         A.  Two.
18         Q.  Okay.  Leadership training.  Of the four,
19    what's the highest that you had participated in?
20         A.  I participated in none of those.
21         Q.  Okay.  Temporary promotion or acting
22    positions for 90 days or more.  What was the highest
23    that you had been assigned to on a temporary promote
24    or acting basis for 90 days or more?
25         A.  It would have been four, No. 4.
```

Baton Rouge Court Reporters, LLC
225-292-8686

Christopher Bullock
November 23, 2020

1      Q.  Was that PIC for sector intelligence or
2   Imperial Beach?
3      A.  Yes, sector intelligence.
4      Q.  Okay.  And you did that for at least
5   90 days?
6      A.  Yes.
7      Q.  Okay.  For headquarters experience, what's
8   the highest that you had been on a permanent basis?
9      A.  Zero.
10      Q.  Yeah.  For sector staff experience, on a
11   permanent basis, which of these had you served on?
12      A.  None.
13      Q.  And for external leadership assignments,
14   which, if any -- if they're all worth the same
15   amount of points, you just tell me.
16      A.  (Indiscernible.)
17              (Reporter clarification.)
18              MR. VOGELTANZ:  He's talking to
19          himself.
20              THE WITNESS:  Yeah, I'm talking to
21          myself.
22      A.  On those, I got detailed to the JTF, but I
23   don't remember if it was 90 days or longer.  So at
24   most a 1, I think.
25   BY MR. VOGELTANZ:

Christopher Bullock
November 23, 2020

157

```
 1        Q.  Okay.  All right.  Just give me one second.
 2   Oh, you know what?  I'm sorry, I skipped one.  I
 3   skipped one.  Go back to formal education.  I'm
 4   sorry, I skipped that on you.
 5        A.  Yeah, I don't have an associate's with my
 6   some college, so that wouldn't be in there.
 7        Q.  Okay.  I appreciate that.  I'd like to
 8   direct your attention to exhibit Bullock 9.
 9                 MR. VOGELTANZ:  I'm going to make
10          Bullock 9 Plaintiff's Exhibit 7.
11            (Exhibit No. 7 was identified.)
12   BY MR. VOGELTANZ:
13        Q.  This one is tough to read, so you're going
14   to have to kind of zoom in.  And I don't know what
15   kind of Adobe product you have on your computer,
16   Mr. Bullock, but if you can change the orientation
17   of the image, it will be easier, because I'm going
18   to want to try to score you on this as well.
19        A.  Okay.
20        Q.  Do you see what I'm looking at, that hiring
21   matrix?
22        A.  Yes, sir.
23        Q.  All right.  Have you ever seen this
24   particular document before, this actual document?
25        A.  No.
```

Baton Rouge Court Reporters, LLC
225-292-8686

Christopher Bullock
November 23, 2020

183

```
 1    best person got the job.
 2         A.  Yes.
 3         Q.  Okay.  How could Mr. Bovino have known that
 4    the best person got the job if he didn't directly
 5    have you compete against Mr. Williams and Mr. Joyner
 6    and the other people that applied?
 7         A.  I don't know.
 8         Q.  If you don't know, then why -- why is it
 9    your testimony that you are sure that the best
10    person was selected?
11         A.  My testimony was that it was appropriate,
12    the way I see it.
13         Q.  Do you believe that the best person was
14    selected for the job?
15         A.  I don't know.
16         Q.  So it's possible that you may not have been
17    the most qualified candidate?
18         A.  I don't know.
19         Q.  Well, if you don't know, I mean, it's
20    possible, then, correct?
21         A.  Yes.
22         Q.  Okay.
23               MR. VOGELTANZ:  Pass the witness.
24               MS. GUTIERREZ:  I don't have any
25         questions.
```

Baton Rouge Court Reporters, LLC
225-292-8686