IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA



**RANDOLPH WILLIAMS III**

**Plaintiff,**

v.

**KEVIN K. MCALEENAN, ACTING
SECRETARY, UNITED STATES
DEPARTMENT OF HOMELAND
SECURITY**

**Defendant.**

**CIVIL NO. 2:19-CV-12841-GGG-DMD**

### PLAINTIFF'S RULE 56.2
### COUNTER-STATEMENT OF DISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.2, plaintiff Randolph Williams responds to each of the alleged, material facts submitted by defendant Pete Gaynor, Acting Secretary of the Department of Homeland Security (DHS), including its agency, United States Customs and Border Protection (CBP) (R. No. 61-9), filed in support of his motion for summary judgment in this matter, as follows.

In Section I below, plaintiff asserts facts that were alleged in his complaint and admitted by defendant in his answer. In Section II below, plaintiff asserts material facts relevant to his response in opposition. In Section III, plaintiff responds to each of the purported uncontested facts set out in defendant's statement, admitting or disputing each as appropriate.

## I. PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS

1.  In 2002, CPB hired Mr. Williams (black) as a United States Border Patrol agent.[1]

2.  Mr. Williams has been continuously employed by CBP since that time and assigned to the Office of the United States Border Patrol.[2]

3.  On or about March 30, 2018, CBP advertised a position for a Supervisory Border Patrol Agent (Division Chief) assigned to USBP's "New Orleans Sector" located in New Orleans, LA.[3]

4.  In April 2018, Mr. Williams applied for the Supervisory Border Patrol Agent (Division Chief) position, GS-1896-14, announced through vacancy announcement USBP-IMP-10168092-JRB and his position at the time was Patrol-Agent-In-Charge (PAIC), GS-1896-13.[4]

5.  Through some means of non-competitive selection, Mr. Williams was passed over in favor of Christopher Bullock and Mr. Bullock entered on duty on October 14, 2018.[5]

6.  On November 28, 2018, Mr. Williams initiated informal EEO contact alleging discrimination based on his race (Black/African American).[6]

7.  On February 14, 2019, CBP issued its Notice of Right to File to Mr. Williams.[7]

---

[1]  R. No. 11 at ¶ 7 (Defendant's Answer) and R. No. 1 at ¶ 7 (Plaintiff's Complaint).
[2]  R. No. 11 at ¶ 8 (Defendant's Answer) and R. No. 1 at ¶ 8 (Plaintiff's Complaint).
[3]  R. No. 11 at ¶ 9 (Defendant's Answer) and R. No. 1 at ¶ 9 (Plaintiff's Complaint).
[4]  R. No. 11 at ¶ 10 (Defendant's Answer) and R. No. 1 at ¶ 10 (Plaintiff's Complaint).
[5]  *See* R. No. 11 at ¶ 11 (Defendant's Answer) and R. No. 1 at ¶ 11 (Plaintiff's Complaint) (Disputed is whether Mr. Bullock's selection was a promotion or a "lateral reassignment", but generally admitted).
[6]  R. No. 11 at ¶ 13 (Defendant's Answer) and R. No. 1 at ¶ 13 (Plaintiff's Complaint).
[7]  R. No. 11 at ¶ 14 (Defendant's Answer) and R. No. 1 at ¶ 14 (Plaintiff's Complaint).

8.  On February 27, 2019, Mr. Williams filed his Individual Complaint of Employment Discrimination in this matter (case no. HS-CBP-00457-2019).[8]

9.  On May 13, 2019, CBP took final action and dismissed Mr. Williams's complaint.[9]

10. On June 28, 2019, CBP mailed notice of its final action to Mr. Williams via USPS certified mail (tracking no. 7017 1450 0001 9087 1647).[10]

11. Mr. Williams first received CBP's final notice via certified mail on July 9, 2019.[11]

12. Mr. Williams filed his federal complaint on September 26, 2019, 79 days after receiving CBP's final action.[12]

13. Mr. Williams served as Supervisory Border Patrol Agent from December 2008 until November 2011 and as Acting Field Operations Supervisor from August 2011 until November 2011 at the Sonoita Border Patrol Station; as Field Operations Supervisor from November 2011 until August 2012 at the Ajo Border Patrol Station; as Acting Special Operations Supervisor, Operational Programs, Tucson Sector, from August 2012 until November 2013; as Special Operations Supervisor, Sonoita Border Patrol Station, from November 2013 until October 2016; as Acting Watch Commander, Sonoita Border Patrol Station, from February 2014 until June 2014; as Acting Watch Commander, Nogales Border Patrol Station, from October 2015 until March 2016; as PAIC, Sector Intelligence Unit, New Orleans Sector, from October 2016 until May, 2017; as PAIC, New Orleans

---

[8]   *See* R. No. 11 at ¶ 15 (Defendant's Answer) and R. No. 1 at ¶ 15 (Plaintiff's Complaint) (Disputed as to whether the complaint was timely filed, but generally admitted).

[9]   R. No. 11 at ¶ 16 (Defendant's Answer) and R. No. 1 at ¶ 16 (Plaintiff's Complaint).

[10]  R. No. 11 at ¶ 17 (Defendant's Answer) and R. No. 1 at ¶ 17 (Plaintiff's Complaint).

[11]  R. No. 11 at ¶ 18 (Defendant's Answer) and R. No. 1 at ¶ 18 (Plaintiff's Complaint).

[12]  *See* R. No. 11 at ¶ 19 (Defendant's Answer) and R. No. 1 at ¶ 19 (Plaintiff's Complaint) (Disputed in Defendant's Answer as to whether action was timely, but generally admitted).

Border Patrol Station, from May 2017 until January 2018; and as Acting DC, New Orleans Sector, from January 2018 until on or about July 7, 2018.[13]

14.    Mr. Williams is currently assigned as the permanent Patrol Agent in Charge of New Orleans Station located in New Orleans, Louisiana and has been since May 2017.[14]

15.    When former CPA John Richards (white) retired, the then-Deputy Chief Patrol Agent of New Orleans Sector, Joseph Banco (white), became Acting Chief Patrol Agent for the sector. [15]

16.    This personnel movement ultimately opened a vacancy for the New Orleans Sector position of Division Chief of Operational Programs. [16]

17.    On January 21, 2018, Acting CPA Banco temporarily promoted Mr. Williams to the position of Acting Division Chief of Law Enforcement Operations. [17]

18.    On or about March 30, 2018, ACPA Banco announced a permanent position for Division Chief of Operational Programs via USAJobs.com. [18]

19.    In early April, while Mr. Williams was already serving as Acting Division Chief of Operational Programs, he applied for permanent promotion to that same position.[19]

20.    On May 7, 2018, ACPA Banco selected Mr. Williams to interview for the position with himself and the then-acting Deputy Chief Patrol Agent of New Orleans Sector, Teresa Pedregon (white, Hispanic). [20]

---

[13]    R. No. 11 at ¶ 22 (Defendant's Answer) and *see* R. No. 1 at ¶ 22 (Plaintiff's Complaint).
[14]    R. No. 11 at ¶¶ 23 & 46 (Defendant's Answer) and R. No. 1 at ¶¶ 23 & 46 (Plaintiff's Complaint).
[15]    R. No. 11 at ¶ 61 (Defendant's Answer) and R. No. 1 at ¶ 61 (Plaintiff's Complaint).
[16]    R. No. 11 at ¶ 62 (Defendant's Answer) and R. No. 1 at ¶ 62 (Plaintiff's Complaint).
[17]    R. No. 11 at ¶ 63 (Defendant's Answer) and R. No. 1 at ¶ 63 (Plaintiff's Complaint).
[18]    R. No. 11 at ¶ 65 (Defendant's Answer) and R. No. 1 at ¶ 65 (Plaintiff's Complaint).
[19]    R. No. 11 at ¶ 66 (Defendant's Answer) and R. No. 1 at ¶ 66 (Plaintiff's Complaint).
[20]    R. No. 11 at ¶ 67 (Defendant's Answer) and R. No. 1 at ¶ 67 (Plaintiff's Complaint).

21. However, during the intervening time period, USBP selected agent Gregory Bovino to become the new, permanent Chief Patrol Agent of New Orleans Sector.[21]

22. On or about May 11, 2018, the job posting for the Division Chief job was cancelled.[22]

23. On July 7, 2018, Mr. Williams "stopped serving" as Acting Division Chief for Law Enforcement Operations. [23]

24. CPA Bovino did not competitively repost the Division Chief position on USAJobs.com.[24]

25. Instead, CPA Bovino laterally promoted another agent currently serving outside of New Orleans Sector, Christopher Bullock, to become the new, permanent, Division Chief of Operational Programs.[25]

26. Mr. Bullock entered on duty on October 14, 2018.[26]

27. Later, Chief Bovino temporarily assigned Bullock to serve as Division Chief of Law Operational Programs.[27]

28. This created a new, temporary opening in the Division Chief of Operational Programs position. [28]

29. CPA Bovino temporarily assigned Robert Rivet (white) to serve as Division Chief of Operational Programs.[29]

---

[21] R. No. 11 at ¶ 68 (Defendant's Answer) and R. No. 1 at ¶ 68 (Plaintiff's Complaint).
[22] *See* R. No. 11 at ¶ 70 (Defendant's Answer) and R. No. 1 at ¶ 70 (Plaintiff's Complaint).
[23] *See* R. No. 11 at ¶ 71 (Defendant's Answer) and R. No. 1 at ¶ 71 (Plaintiff's Complaint) (Disputed as to whether Chief Bovino removed Mr. Williams or he simply "stopped serving").
[24] *See* R. No. 11 at ¶ 73 (Defendant's Answer) and R. No. 1 at ¶ 73 (Plaintiff's Complaint).
[25] R. No. 11 at ¶ 74 (Defendant's Answer) and R. No. 1 at ¶ 74 (Plaintiff's Complaint).
[26] R. No. 11 at ¶ 76 (Defendant's Answer) and *see* R. No. 1 at ¶ 76 (Plaintiff's Complaint).
[27] R. No. 11 at ¶ 83 (Defendant's Answer) and R. No. 1 at ¶ 83 (Plaintiff's Complaint).
[28] R. No. 11 at ¶ 84 (Defendant's Answer) and R. No. 1 at ¶ 84 (Plaintiff's Complaint).
[29] R. No. 11 at ¶ 85 (Defendant's Answer) and R. No. 1 at ¶ 85 (Plaintiff's Complaint).

30. Just prior to his temporary assignment to the position of Division Chief of Operational Programs, Robert Rivet served as Operations Officer at the New Orleans Sector.[30]

31. Being assigned to Acting Division Chief of Operational Programs made Robert Rivet Mr. Williams first line supervisor.[31]

32. Mr. Williams complained to Chief Bovino.[32]

33. Eventually, CPA Bovino competitively posted the Division Chief position, and selected Mr. Williams to serve as Acting Division Chief of Operational Programs until approximately July 2019, when CPA Bovino hired another white USBP agent to fill the position of Deputy Chief Patrol Agent.[33]

34. With regards to the events and allegations in this case, CPA Bovino was acting within the course and scope of his employment.[34]

---

[30] *See* R. No. 11 at ¶ 86 (Defendant's Answer) and R. No. 1 at ¶ 86 (Plaintiff's Complaint) (Disputed as to whether Operations Officer at the New Orleans Sector is a position that is less senior to Mr. Williams' position of PAIC, but generally admitted).

[31] R. No. 11 at ¶ 87 (Defendant's Answer) and *see* R. No. 1 at ¶ 87 (Plaintiff's Complaint) (Disputed as to whether Rivet had gone from a less senior position relative to Mr. Williams to a more senior position).

[32] R. No. 11 at ¶ 88 (Defendant's Answer) and R. No. 1 at ¶ 88 (Plaintiff's Complaint).

[33] R. No. 11 at ¶ 89 (Defendant's Answer) and R. No. 1 at ¶ 89 (Plaintiff's Complaint).

[34] *See* R. No. 11 at ¶ 107 (Defendant's Answer) and R. No. 1 at ¶ 107 (Plaintiff's Complaint).

## II.     PLAINTIFF'S STATEMENT OF MATERIAL FACTS RELEVANT TO HIS RESPONSE IN OPPOSITION

35.     Within the United States Border Patrol ("USBP"), the "effective date" of any personnel action is referred to as the "entered on duty" date, or "EOD."

36.     Within the USPB, the effective date of an employee's lateral transition or promotion to a new position is the date that employee "entered on duty" (colloquially known as the date the employee "EOD'd" into the position).

37.     The effective date, and the EOD date, of the personnel action promoting Mr. Bullock over Mr. Williams to the position of Supervisory Border Patrol Agent (Division Chief) in New Orleans Sector in this case was, at the earliest, October 14, 2018.

38.     Thus, Mr. Williams timely initiated EEO contact in this case when he made that contact on November 28, 2018, which was within 45 days of October 14, 2018.

39.     Prior to working for CBP, Mr. Williams served honorably in the United States Air Force from March 23, 1995 through February 22, 2000.[35]

40.     After joining CBP, Mr. Williams was assigned as a Border Patrol Agent at Nogales Border Patrol Station in the Tucson Sector, and served in that capacity from March 2002 through December 2008.[36]

41.     In December 2008, Mr. Williams was promoted to Supervisory Border Patrol Agent assigned to the Sonoita Border Patrol Station and served in that capacity through November 2011.[37]

---

[35]   Randolph Williams Resume Submitted to USAjobs for Division Chief Position at 5 (a copy of which is attached as Exhibit A).

[36]   *Id.* at 4.

[37]   *Id.*

42.     Between August 2011 and November 2011, Mr. Williams served as Acting Field Operations Supervisor.[38]

43.     In November 2011, Mr. Williams was promoted to permanent Field Operations Supervisor assigned to Ajo Border Patrol Station and served in that capacity through August 2012.[39]

44.     In August 2012, Mr. Williams began serving as Acting Special Operations Supervisor assigned to Tucson Sector and served in that capacity through November 2013.[40]

45.     In November 2013, Mr. Williams was promoted to permanent Special Operations Supervisor assigned to the Sonoita Border Patrol Station and served in that capacity through October 2016.[41]

46.     Between February 2014 and June 2014, Mr. Williams served as Acting Watch Commander assigned to the Sonoita Border Patrol Station.[42]

47.     Between October 2015 and March 2016, Mr. Williams served as Acting Watch Commander assigned to the Nogales Border Patrol Station.[43]

48.     In October 2016, Mr. Williams was promoted to Patrol Agent in Charge of New Orleans Sector Intelligence Unit and served in that capacity until May 2017.[44]

49.     Beginning in May 2017, Mr. Williams has been assigned as the Patrol Agent in Charge at the New Orleans Border Patrol Station.[45]

---

[38]   *Id.*
[39]   *Id.*
[40]   *Id.* at 3.
[41]   *Id.* at 2.
[42]   *Id.*
[43]   *Id.* at 3.
[44]   *Id.* at 1.
[45]   *Id.*

50. Mr. Williams was selected to serve as Acting Division Chief beginning in January 2018 and was removed on July 7, 2018.[46]

51. Acting Chief Patrol Agent Banco and Deputy ACPA Pedregon used a matrix to identify the strongest applicants, identifying six (6) individuals who should be interviewed.[47]

52. At some point prior to May 7, Bovino called his old friend and subordinate Christopher Bullock, and informed him that he was being selected as the new CPA of New Orleans sector, that there was also a vacant Division Chief position, and that he wanted Bullock to apply via memorandum.[48]

53. Mr. Bovino maintains that he does not "remember" encouraging Mr. Bullock to apply and only that Mr. Bullock somehow "learned that there was a vacant division chief open in the New Orleans Sector."[49]

54. On May 7, Mr. Bullock sent an email to his wife, Susan Bullock, with the first draft of his lateral promotion memo that he intended to send to Joseph Banco, the ACPA of New Orleans Sector at that point.[50]

55. On May 8, 2018, ACPA Banco emailed Bovino and sent along the list of six candidates.[51]

---

[46] *Id.*; *see* R. No. 11 at ¶ 71 (Defendant's Answer) and R. No. 1 at ¶ 71 (Plaintiff's Complaint).

[47] Deposition of Joseph Banco, November 16, 2020, at 41:18-22 (excerpts of which are attached as Exhibit B).

[48] Deposition of Christopher Bullock, November 23, 2020, at 50:2-7, 51:8-13, & 53:18-54:2 (excerpts of which are attached as Exhibit C).

[49] Deposition of Gregory Bovino, November 30, 2020, at 111:1-112:5 (excerpts of which are attached as Exhibit D).

[50] Email thread between Christopher Bullock and Susan Bullock about Lateral Memo (a copy of which is attached as Exhibit E).

[51] Email thread between Banco, Bovino, and Hudson at 4 (a copy of which is attached as Exhibit F).

56. Mr. Bovino responded to Banco on May 8, 2018, and asked Banco "to hold off on making any selections until I can get in on the process."[52]

57. ACPA Banco pushed back on Mr. Bovino's request, instead asking him if he would like to participate in the interviews as they were doing them telephonically.[53]

58. Mr. Banco was reticent to hold off the interviews because they had already been scheduled for the following Monday, and cancelling them would be bad "optics" as they would have to "tell those personnel that, um, they were not being interviewed."[54]

59. On May 9, 2018, Mr. Bovino sent an email to Richard Hudson, the Deputy Chief of Operational Programs at USBP Headquarters which stated "I discussed with Hastings and he is ok with me holding selections. Banco is not on board however."[55]

60. On May 9, 2018, Mr. Bovino sent an email to Richard Hudson which stated "Roger. I may re-announce the whole position which will also send a statement to NLL staff which may need "rebalancing"."[56]

61. Mr. Bovino testified that "rebalancing" meant he "felt that the New Orleans staff was attempting to fill positions before I got there, and I felt that I probably needed to send a message to the New Orleans staff by me filling those positions and not them."[57]

62. During his deposition, when asked who needed to be "rebalanced" Mr. Bovino stated "The entire sector staff."[58]

---

[52] *Id.* at 4.
[53] *Id.* at 3.
[54] Exhibit B, Dep. of Banco at 41:9-42:14.
[55] Exhibit F at 3, Email thread between Banco, Bovino, and Hudson.
[56] *Id.* at 2.
[57] Exhibit D, Dep. of Bovino at 72:4-8.
[58] *Id.* at 73:8-12.

63. As of May 9, 2018, it is objectively true that the New Orleans Sector senior staff was very diverse in comparison to other predominantly white sector leadership, including Acting Deputy Chief Patrol Agent Pedregon who is a Latino lesbian openly married to another woman who worked in the same sector and Randolph Williams a black African American man who was serving as Acting Division Chief.

64. On May 9, 2018, Mr. Bovino sent an email to Richard Hudson which stated "Gave it some thought, and I think it would be best to cancel the list and wait 90 days. Rivet is acting Division Chief already and he can continue in that role. I don't think the announcement received the attention it should've, and we will make more of an effort to recruit the right pool of candidates. How do I go about canceling the list at this point?"[59]

65. On May 9, 2018, Mr. Hudson sent an email to Mr. Bovino which stated "Tell Joe to cancel the list via your MRO. I would have them notify HQ WFM. You will need to come up with a reason. I'll see if I can get some of the most used reasons. In a brief right now."[60]

66. On May 9, 2018, Mr. Hudson sent a follow up email to Mr. Bovino which stated: "Use this reason: (direct from MRO) Applicants certified did not possess desired skillset** (popular response)".[61]

67. Mr. Bovino admitted during his deposition that he never actually reviewed the resumes and credentials of the six interviewees before cancelling the list.[62]

68. On May 23, 2018, Mr. Bullock emailed Mr. Bovino a draft of his Lateral Reassignment Memorandum and asked "What say you?"[63]

---

[59] Exhibit F at 2, Email thread between Banco, Bovino, and Hudson.
[60] *Id.* at 1.
[61] *Id.*
[62] Exhibit D, Dep. of Bovino at 74:22-25.
[63] Email between Bovino and Bullock Discussing Memo Containing Confederate Meme at 3 (a

69.     On May 24, 2018, Mr. Bovino responded and stated: "Chris, this looks good. For the Hiring Flexibilities Memo, you said "Division Chief". Perhaps you should put WHICH Division Chief you are looking at so they can't pull any type of switcharoo and then you go to ops support. What do you think?"[64]

70.     On May 24, 2018, Mr. Bullock responded and stated: "I will do what you want. I just don't want to put limits on it. I think you get to decide which is which anyway, no?"[65]

71.     On May 24, 2018, Mr. Bovino responded and stated: "I'm not sure if I can decide which is which if it's announcement specific. We want you in operations and not support. Keep it as you have it – don't want to mess anything up."[66]

72.     On May 25, 2018, Mr. Bullock emailed Mr. Bovino a meme he created by searching for specific images and then putting titles over the images. The first title reads "Chief Bovino" and then a picture of Civil War Confederate General and slave owner William Mahone. The second title reads "NLL All Hands Meeting" and then a picture of a large number of confederate soldier reenactors grouped together around a prominently displayed Confederate Battle Flag. The third title reads "NLL Sector HQ." and then a picture of a Civil War era artillery unit in a fortified position.[67]

73.     Mr. Bovino responded within a maximum of 90 seconds and responded "Oh jeez. DELETE!!!!"[68]

---

copy of which is attached as Exhibit G).
[64]    *Id.*
[65]    *Id.*
[66]    Exhibit G at 3, Email between Bovino and Bullock Discussing Memo Containing Confederate Meme.
[67]    *Id.* at 1-2.
[68]    *Id.* at 1.

74. At some point between May 25 and July 9, 2018, Mr. Bullock stated that he spoke with Mr. Bovino and Mr. Bovino "asked [Bullock] to wait until he arrived [to New Orleans Sector] before I submitted the request."[69]

75. Mr. Bullock submitted his memorandum and resume on July 9, 2019—the exact enter on duty date of Mr. Bovino into his position as CPA.[70]

76. Mr. Bovino never took any further action against Mr. Bullock with regards to the racially charged email.[71]

77. During Mr. Brian Hasting's deposition, he stated, after looking at the Confederate meme email, "Mr. Bullock I have to report now if it hasn't been reported already."[72]

78. On July 19, 2018, CPA Bovino sent a recommendation memorandum for the lateral promotion/reassignment of Christopher Bullock to the position of Division Chief in New Orleans Sector.[73]

79. Mr. Williams has received written discipline only once during his entire career (for dinging a USBP trailer with his USBP vehicle in a parking lot), and none in the past decade.

80. In 2014, 2015, 2016, 2018, and 2019, Mr. Williams received the highest grade possible on his yearly performance review (and, in 2017, Mr. Williams received the second-highest grade possible).

81. New Orleans Sector includes five Stations: New Orleans, Baton Rouge, Lake Charles, Mobile, and Gulfport.

---

[69]  Exhibit C, Dep. of Bullock at 148:10-19.
[70]  Bullock Memorandum and Resume (a copy of which is attached as Exhibit H).
[71]  Exhibit D, Dep. of Bovino at 220:12-222:13.
[72]  Deposition of Brian Hastings, November 6, 2020, at 113:20-114:4 (excerpts of which are attached as Exhibit N).
[73]  Bovino Memorandum Recommending Bullock's Lateral Promotion (a copy of which is attached as Exhibit R).

82.    New Orleans Sector includes five Stations: New Orleans, Baton Rouge, Lake Charles, Mobile, and Gulfport.

83.    At the time of this case, the PAIC of Gulfport Station was Jon Joyner, who is also a Black man.

84.    In 2018, New Orleans Sector had a typical leadership hierarchy.  The top decision-maker was the Chief Patrol Agent, followed by the Deputy CPA.[74]

85.    Reporting to the Deputy CPA were three Division Chiefs – the Chief of Operations, Chief of Programming, and Chief of Mission Readiness.[75]

86.    In turn, the PAICs of each Station within the Sector reported directly to the Division Chief of Operations.[76]

87.    Jon Joyner, the PAIC of Gulfport at the time, had applied to the Division Chief competitive announcement at the same time Mr. Williams did, and was also selected as one of the six original interviewees.

88.    In the matrix ACPA Banco and ADCPA Pedregon used to determine the six original interviewees, Mr. Williams scored the second highest with 38 points.[77]

89.    Another candidate named Eric Billings scored one point higher with 39 points.[78]

90.    USBP utilizes a particular type of scoring matrix for promotions at the Headquarters level known as a "Kepner-Tregoe Exercise."[79]

---

[74]   2018 New Orleans Sector Organizational Chart (a copy of which is attached as Exhibit I).
[75]   Exhibit I, 2018 New Orleans Sector Organizational Chart.
[76]   *Id.*
[77]   Scoring Matrix used by Banco and Pedregon for Division Chief Interviewee Selection (a copy of which is attached as Exhibit S).
[78]   Exhibit S, Scoring Matrix used by Banco and Pedregon for Division Chief Interviewee Selection.
[79]   Deposition of Michael Harrison, November 18, 2020, at 61:15-62:20 (excerpts of which are attached as Exhibit T) and Kepner-Tregoe Exercise (a copy of which is attached as Exhibit U).

91.    Acting Chief Patrol Agent Michael Harrison was familiar with this Exercise from his time at Headquarters and used it to compare applicants for a Division Chief position at New Orleans Sector that was announced in February 2020.[80]

92.    During his deposition, ACPA Michael Harrison scored Mr. Williams using the Kepner-Tregoe Exercise and Mr. Williams scored 29 points.[81]

93.    During depositions, Mr. Bullock scored himself on the Exercise and scored only 22 points.[82]

---

[80] Exhibit T, Dep. of Harrison at 61:15-65:12.
[81] *See* Exhibit T, Dep. of Harrison at 71:6-99:15.
[82] Exhibit C, Dep. of Bullock at 154:17-157:6.

### III.   PLAINTIFF'S COUNTER-STATEMENT OF DISPUTED FACT

D-1.[83]   During EEO administrative proceedings, Plaintiff claimed: "On or around August 6, 2018, he learned that he was not selected for the position of Division Chief, GS-1896-14, advertised under Job Opportunity Announcement Number: USBP-IMP-10168092-JRB (JOA 10168092.")." Exhibit A-3, Plaintiff's Clarification Letter and Attachments, at Bates DHS0013.

**Disputed.  Exhibit A-3 is a letter prepared by Mr. Williams as a response to a letter from the EEO investigator Danielle N. Davidson.[84]  The quoted language was copy and pasted from Ms. Davidson's letter, at bates DHS0010 ¶ 2, not Mr. Williams. Rather, in the same document, Mr. Williams specifically states: "I wasn't officially aware that I wasn't selected until Mr. Bullock's official Entry on Duty (EOD) which was October 15, 2018."[85]**

D-2.   In March of 2018, USBP advertised, through a vacancy announcement on USAJobs, a Division Chief position. Exhibit A-1, Plaintiff's Individual Complaint of Employment Discrimination, Bates DHS0004, ¶ 1.

**Admitted.**

D-3.   On April 4, 2018, Plaintiff applied for the advertised Division Chief position and was selected to be interviewed for the vacant position. *Id.*

**Admitted.**

D-4.   On May 11, 2018, Plaintiff was advised that the vacancy announcement was cancelled. *Id.*

**Admitted.**

---

[83]   D-1, referring to Defendant's Statement of Undisputed Fact ¶ 1.
[84]   R. No. 61-2 at 10-13 (EEO Investigator Davidson's Letter).
[85]   R. No. 61-2 at 17 ¶ 2 (Plaintiff's Clarification Letter).

D-5.    On August 6, 2018, Plaintiff attended a staff meeting wherein Chief Patrol Agent Bovino

("Chief Bovino") announced that Christopher Bullock had been non-competitively

selected for the vacant Division Chief position sought by Plaintiff. Exhibit A-3, Plaintiff's

Clarification Letter and Attachments, at Bates DHS0014 and DHS0015.

**Disputed.    Defendant misquotes the documents it cites, in which Plaintiff**

**unambiguously explains that he became aware that he was not selected on October**

**15, 2018:**

> **Chief Patrol Agent Bovino announced that he selected Mr. Bullock in**
> **August 2018 during a staff meeting. That announcement was far from**
> **official. If the position was officially announced during a vacancy**
> **announcement, I would have received an official notice of non-selection**
> **from USA Staffing. I did not know whether Mr. Bullock would accept,**
> **if he cleared vetting, or if Headquarters approved his selection.**
>
> **I wasn't officially aware that I wasn't selected until Mr. Bullock's**
> **official Entry on Duty (EOD) which was October 15, 2018.**

**Furthermore, Plaintiff made his reasons for drawing this distinction clear, explaining**
**that he "knew for sure [he] was not going to be promoted" only on Bovino's effective**
**start date because "[t]he official personnel action with CBP is effective upon their**
**EOD" and "[i]n the New Orleans sector alone, there have been two recent incidents**
**where the person that was offered and accepted a position later declined and the**
**position was then offered to the alternate candidate..."[86]**

D-6.    Chief Bovino did not competitively repost the Division Chief position on USAJobs.com

but laterally reassigned Mr. Bullock, an agent who had been working outside of the New

Orleans Sector. Rec. Doc. 1, Complaint, ¶¶ 73, 74.

**Disputed. Mr. Bullock was not laterally "reassigned", he was laterally promoted over**

**Mr. Williams.[87]  Otherwise, plaintiff admits the balance of the paragraph.**

---

[86]    R. No. 61-2 at 18 (Plaintiff's Clarification Letter).
[87]    *See* R. No. 1 at ¶¶ 9 & 74.

D-7.    Plaintiff did not apply for a lateral reassignment to the Division Chief position. Exhibit G, Deposition of Randolph Williams, p. 12, lines 12-16;

**Admitted.**

D-8.    Plaintiff was not eligible to apply for a lateral reassignment to the Division Chief position. Exhibit G, Deposition of Randolph Williams, p. 13, lines 12-16.

**Admitted.    Instead, Mr. Williams applied for the Division Chief position via competitive application, and Mr. Bovino admitted during his deposition that he selected Mr. Bullock over Mr. Williams for the Division Chief position.**

D-9.    The Office of Civil Rights and Civil Liberties ("CRCL") dismissed Plaintiff's administrative EEO complaint because of Plaintiff's untimely contact with an EEO counselor. Exhibit A-5, Bates DHS0035.

**Admitted insofar that this statement accurately represents the CRCL's Procedural Dismissal.**

D-10.   The CRCL found that Plaintiff learned of the vacancy announcement cancellation on May 11, 2018, and was informed of the lateral reassignment selection on August 6, 2018, which is 156 days and 69 days beyond the 45-day requirement to initiate EEO contact. *Id.* at Bates DHS0037.

**Admitted insofar that this statement accurately represents the CRCL's Procedural Dismissal.**

D-11.   The USBP is a component agency of CBP, within DHS. Exhibit D, Declaration of Richard M. Hudson, ¶ 2.

**Admitted.**

D-12.   The USBP is the primary federal law enforcement organization responsible for preventing
the entry of terrorists and terrorist weapons from entering the United States between official
U.S. Customs and Border Protection ports of entry. *Id.*

**Admitted.**

D-13.   Its traditional mission is to enforce immigration laws and to detect, interdict and apprehend
those who attempt to illegally enter or smuggle people or contraband across U.S. borders
between official ports of entry. *Id.*

**Admitted.**

D-14.   The USBP has its headquarters in Washington, D.C. *Id.* at ¶ 3.

**Admitted.**

D-15.   The Chief of the USBP sits atop the organizational chart, the Deputy Chief of the USBP is
the second highest position, and the Chief of the Law Enforcement Operations Directorate
is third in command. *Id.*

**Admitted.**

D-16.   The USBP divides its operations into twenty field offices known as sectors. *Id.* at ¶ 4.

**Admitted.**

D-17.   Each sector has a Chief Patrol Agent which is the highest management official in a sector,
plans, directs, and implements all facets of the Border Patrol program and related activities
in the sector. *Id.*

**Admitted.**

D-18.   Similarly to headquarters, each sector has a Deputy CPA who is second in the chain of
command, and then two or three Division Chiefs depending on the size of the sector. *Id.*

**Admitted.**

D-19.   All CPAs directly report to the Chief of the Law Enforcement Operations Directorate at headquarters. *Id.*

**Admitted.**

D-20.   In April of 2018, Richard Hudson, then acting Chief of the Law Enforcement Operations Directorate at USBP, recommended the selection of Gregory Bovino as the CPA of the New Orleans sector. *Id.* at ¶ 5.

**Sufficient discovery has not been completed on this point for Mr. Williams to admit or deny it.**

D-21.   The Deputy Chief of the USBP and Chief of the USBP concurred with Mr. Hudson's recommendation and Chief Bovino was selected as the New Orleans CPA with a start date in July 2018. *Id.*

**Sufficient discovery has not been completed on this point for Mr. Williams to admit or deny it.**

D-22.   The New Orleans Sector, by budget and assigned personnel, is one of the smallest USBP sectors. *Id.*

**Admitted.**

D-23.   Prior to Chief Bovino's arrival, the New Orleans sector's interdiction and apprehension statistics were considered subpar by USBP management personnel at headquarters. *Id.*

**Sufficient discovery has not been completed on this point for Mr. Williams to admit or deny it.**

D-24.   The New Orleans sector had the reputation of an underperforming sector with numerous personality conflicts amongst the sector management team. *Id.*

**Disputed.**

D-25.  Mr. Hudson recommended Chief Bovino as the New Orleans CPA, in part, because of Mr. Hudson's belief that Chief Bovino could increase sector productivity and improve employee morale. *Id.*

**Sufficient discovery has not been completed on this point for Mr. Williams to admit or deny it.**

D-26.  After selected for the New Orleans CPA, Chief Bovino decided asked [sic] that two vacancy announcements for positions within the New Orleans Sector be cancelled so that he could be more involved in the selection process and potentially recruit candidates who he felt would be strong candidates for the positions. Exhibit B, Declaration of Gregory Bovino, ¶ 5.

**Disputed.  Emails between Chief Bovino, Christopher Bullock, and Richard Hudson strongly suggest that Mr. Bovino lied to Mr. Hudson regarding his reason for cancelling the Division Chief position, not to recruit additional candidates, but to select Christopher Bullock without going through the competitive application process against Mr. Williams who was, at the time, the Acting Division Chief of Operations.[88]**

D-27.  It is customary for an incoming CPA to play a role in the selection of vacant positions on his senior staff. Exhibit D, Declaration of Richard Hudson, ¶ 7.

**Amitted.  Further, Acting CPA Banco expressly invited Mr. Bovino to participate in interviews for the Divisoin Chief position, which Mr. Bovino declined.**

D-28.  It was not uncommon for a CPA to cancel a certificate if the CPA did not believe that any of the candidates had the desired traits for the position. *Id.*

---

[88]  *See* Exhibit F, Email thread between Banco, Bovino, and Hudson.

**Disputed insofar as Mr. Bovino admits during his deposition that he did not know Mr. Williams's qualifications for the Division Chief position at the time he decided to cancel the application list.**

D-29. CBP, including the USBP, is able to fill vacant positions through a number of different procedures. Exhibit E, Declaration of Michael Rosamond, ¶ 2.

**Admitted.**

D-30. One such procedure is a non-competitive lateral reassignment. *Id.*

**Admitted.**

D-31. To be eligible for a lateral reassignment, a candidate must currently hold or have previously held a position with the same or higher full performance grade level on a permanent basis and not have been demoted for conduct or performance issues. *Id.*

**Admitted.**

D-32. Border Patrol Agents generally seek a lateral reassignment by submitting a memorandum to the CPA of the sector that they wish to be reassigned to. *Id.* at ¶ 3.

**Admitted.**

D-33. If the Chief would like to select an employee who applied for a non-competitive lateral reassignment, he may do so in coordination with the approval of USBP Headquarters. *Id.*

**Admitted insofar as this procedure exists, but disputed insofar as official USBP policy at the time discouraged the practice.**

D-34. Guidance issued by Ronald Vitiello, Chief of USBP, in 2017 stated that lateral reassignment requests were to be used infrequently, but were still permissible as long as the CPA coordinated with the Law Enforcement Operations and Mission Readiness Operations Directorates. *Id.*

**Admitted.**

D-35. In the month following the cancellation of the vacancy announcement, Chief Bovino received, via memorandum, two lateral reassignment requests for the Division Chief position. Exhibit B, Declaration of Gregory Bovino, ¶ 6.

**Disputed. Mr. Bovino recruited Mr. Bullock for the Division Chief position prior to when Mr. Bovino cancelled the Division Chief announcement.[89]**

D-36. The first request for lateral reassignment came from Supervisory Border Patrol Agent Eric Billings and, thereafter, Deputy Patrol Agent in Charge (DPAIC) Christopher Bullock submitted the second request for lateral reassignment. *Id.* at ¶ 7; see also Exhibit B-1, Memorandum, Recommendation for Vacant GS-14 Division Chief, New Orleans Sector.

**Disputed. Mr. Bovino recruited Mr. Bullock for the Division Chief position prior to when Mr. Bovino cancelled the Division Chief announcement.[90] Mr. Bovino then coached Mr. Bullock the correct language to use in the memorandum, at the latest, 13 days after the Division Chief application was cancelled.**

D-37. Both agents were eligible for a lateral reassignment because they held or previously held a GS-14 position. Exhibit B, Declaration of Gregory Bovino, ¶ 6.

**Admitted.**

D-38. As the CPA, Chief Bovino did not have the authority to grant a lateral reassignment request to a GS-14 position. *Id.* at ¶ 9.

---

[89] *See* Email between Bovino and Bullock Discussing Memo Containing Confederate Meme at 3 (a copy of which is attached as Exhibit G).

[90] *See* Email between Bovino and Bullock Discussing Memo Containing Confederate Meme at 3 (a copy of which is attached as Exhibit G).

**Disputed insofar as, per the deposition testimony in the case, a Chief Patrol Agent was required to receive concurrence from Headquarters on all Division Chief placements whether by lateral promotion or competitive application.**

D-39. On July 19, 2018, Chief Bovino sent a formal request for Lateral Reassignment of Mr. Bullock to Mr. Hudson, Acting Chief Law Enforcement Operations Directorate at Headquarters, setting forth his reasons for believing that Mr. Bullock was right person for the Division Chief position at the New Orleans Sector. Exhibit B-1, Bates DHS001-DHA008.

**Disputed. Mr. Bovino contacted Mr. Hudson on July 9, the same day that Mr. Bovino entered on duty as the CPA of New Orleans Sector.**

D-40. Chief Bovino learned that he also needed the concurrence of Scott Luck, Acting Deputy Chief of USBP at Headquarters. Exhibit B, Declaration of Gregory Bovino, ¶ 10.

**Sufficient discovery has not been completed on this point for Mr. Williams to admit or deny it.**

D-41. On July 30, 2018, Chief Bovino sent a Memorandum Recommendation for Vacant GS-14 Division Chief, New Orleans Sector to not only Mr. Hudson but also Scott Luck. *Id.*; see also Exhibit B-1, Bates DHS009-DHA010.

**Sufficient discovery has not been completed on this point for Mr. Williams to admit or deny it.**

D-42. Chief Bovino's request to laterally reassign Mr. Bullock from Tucson Sector to the vacant Division Chief at New Orleans Sector was approved by both Mr. Hudson and Mr. Luck. *Id.*; see also Exhibit B, Declaration of Gregory Bovino, ¶ 10.

**Admitted insofar as the promotion of Mr. Bullock to the position of Division Chief was approved.**

D-43.  While Mr. Williams had reached a higher rank than Mr. Bullock, Mr. Hudson considers Mr. Bullock's experience as the DPAIC at Imperial Beach and the Tucson Intelligence Unit to be considerably more complex and valuable than Mr. Williams' experience as PAIC in the New Orleans sector. Exhibit D, Declaration of Richard Hudson, ¶ 10.

**Disputed.  Mr. Williams was never compared to Mr. Bullock during the promotional process in this case.  Based on the scoring matrix used by USBQ headquarters at the time, Mr. Williams demonstrably scored higher than Mr. Bullock.  In any event, the facts strongly suggest that Mr. Bovino did not secretly recruit Mr. Bullock because of his experience, but because of Mr. Bullock's race and race-based attitudes.**

D-44.  First, Mr. Williams supervised fewer than twenty employees and operations were only conducted for forty hours per week. *Id.*

**Disputed.  Mr. Williams always worked more than 40 hours per week and, when serving as the Acting Division Chief of Operations, directly or indirectly supervised close to 75 employees at any time.**

D-45.  Mr. Bullock supervised hundreds of employees and the operations were conducted twenty-four hours a day, seven days a week. *Id.*

**Disputed.  Mr. Bullock did not work 24 hours a day, seven days a week.**

D-46.  Second, Imperial Beach and Tucson were two of the USBP's busiest areas and were known for progressive law enforcement techniques and strategies. *Id.*

**Sufficient discovery has not been completed on this point for Mr. Williams to admit or deny it. That said, Mr. Williams possessed significant supervisory experience while stationed at Sonoita and Ajo Stations on the Southwest Border.**

D-47. Professional experience of a DPAIC at the Imperial Beach Station, like that of Mr. Bullock's, makes a candidate objectively better suited for promotion than a candidate with experience as a Patrol Agent in Charge in the New Orleans Sector. Exhibit C, Declaration of Scott Luck, ¶ 6.

**Disputed. Based on the scoring matrix used by USBQ headquarters at the time, Mr. Williams demonstrably scored higher than Mr. Bullock. In any event, the facts strongly suggest that Mr. Bovino did not secretly recruit Mr. Bullock because of his experience, but because of Mr. Bullock's race and race-based attitudes.**

D-48. The heart of the USBP mission and its most difficult obstacles take place on the Southwest Border. *Id.*

**Admitted insofar as the Southwest Border is significant both in terms of law enforcement activity and promotional potential.**

D-49. The bulk of the USBP apprehensions, people and contraband, occur on the Southwest Border. *Id.*

**Admitted.**

D-50. It is also where Border Patrol Agents are most likely to face dangers from the drug cartels or other criminal elements. *Id.*

**Admitted.**

D-51. The Imperial Beach DPAIC is supervising hundreds of agents at a station who put themselves in danger every day in furtherance of the USBP mission. *Id.*

> **Disputed insofar as it implies that USBP agents throughout the United States do not place their lives on the line every day at work. Mr. Williams possessed significant supervisory experience while stationed at Sonoita and Ajo Stations on the Southwest Border.**

D-52. The Imperial Beach station operates 24 hours a day, seven days a week. *Id.*

> **Sufficient discovery has not been completed on this point for Mr. Williams to admit or deny it.**

D-53. To successfully serve in this position, an agent must have a strong grasp of the USBP's strategic vision and be able to promptly and appropriately respond to the emergencies inherently attached to the position. *Id.*

> **Sufficient discovery has not been completed on this point for Mr. Williams to admit or deny it.**

D-54. In addition to being operationally sound, the Imperial DPAIC must be able to appropriately handle the issues that naturally arise when managing a large workforce—the majority of which are members of a collective bargaining unit. *Id.*

> **Sufficient discovery has not been completed on this point for Mr. Williams to admit or deny it.**

D-55. A PAIC in the New Orleans Sector simply does not face the same operational or personnel-related complexities. *Id.*

> **Disputed.**

D-56. A PAIC in the New Orleans Sector supervises fewer than 20 employees, and the operations, based primarily on its geographic location and budget constraints, are far less complex than those on the Southwest Border. *Id.*

**Disputed. When serving as the Acting Division Chief of Operations, Mr. Williams directly or indirectly supervised close to 75 employees at any time.**

D-57. The New Orleans Sector only received funding to staff an 8-hour day/ 5-day a week workweek. *Id.*

**Disputed. Mr. Williams always worked longer than 40 hours per week.**

D-58. The pay grades of the two positions are reflective of the complexity and responsibility of the positions. *Id.*

**Disputed.**

D-59. The Agency grades the Imperial Beach DPAIC Position as a GS-14 and grades the New Orleans PAIC position as a GS-13. *Id.*

**Admitted. That said, Mr. Williams previously served as the Acting Division Chief of Operations at New Orleans Sector, a permanent position which USBP grades as a GS-14 position.**

Respectfully submitted:

/s/ Kevin S. Vogeltanz
Kevin S. Vogeltanz, TA (Bar #32746)
The Law Office of Kevin S. Vogeltanz, LLC
823 Carroll Street, Suite A / Mandeville, LA 70448
Telephone: (504) 275-5149
Facsimile: (504) 910-1704
Email: vogeltanz@gmail.com

*Counsel for Randolph Williams, III*


## LOCAL RULE 5.4 CERTIFICATION

Pursuant to Local Rule 5.4, no certificate of service is required for this motion because all parties are electronic filers and will receive notice through the court's electronic filing system.

/s/ Kevin S. Vogeltanz